**Perry SILVER**

v.

**GENE K. KOLBER ADVERTISING, INC.**

**Civ. A. No. 79–1150.**

United States District Court,
E. D. Pennsylvania.

June 30, 1981.

---

David I. Grunfeld, Steinberg, Greenstein, Gorelick & Price, Philadelphia, Pa., for plaintiff.

Robert Weiner, Philadelphia, Pa., for defendant.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Perry Silver brought this action to recover commissions allegedly owed to him by Gene K. Kolber Advertising, Inc. under a contract of employment. Kolber Advertising has counterclaimed under the same contract. The plaintiff claims the sum of $16,263.73 and the defendant counterclaims for $9,560.35. The court has jurisdiction under 28 U.S.C. § 1332 in that the plaintiff is a citizen of New York, the defendant is a Pennsylvania corporation with its principal place of business in Pennsylvania, and the amount in controversy is more than $10,000. Because the parties entered into the contract in Pennsylvania and envisioned performance here, Pennsylvania law governs the case. *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85

L.Ed. 1477 (1941); *In re Danz*, 444 Pa. 411, 283 A.2d 282 (1971). The case was heard without a jury on April 1 and 2, 1981. This memorandum constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

I

The business relationship between the parties to this action dates back to 1972. Perry Silver, the plaintiff, was then general sales manager of WIBG radio in Philadelphia. The defendant, Gene K. Kolber Advertising, Inc., was one of the advertising agencies to which plaintiff sold radio air time. Kolber Advertising is wholly owned by Gene K. Kolber, who is also the agency's founder and president.

Perry Silver first began working for Kolber Advertising in August, 1975. At that time WIBG radio was sold and the plaintiff anticipated that the new owners, in keeping with industry practice, would replace the station's management upon takeover. According to the plaintiff, Gene Kolber suggested that he leave WIBG and become an account executive at the Kolber agency. But Gene Kolber testified that he dissuaded the plaintiff from leaving the station and joining the agency because there would be only "lean pickings" for him in advertising due to his lack of experience in that business. In either case, the result was that Perry Silver became an outside commissioned salesman for the Kolber agency while retaining his position with WIBG. He was to receive 50% of any net profit earned by the agency on accounts that he brought to it.

By February, 1977 Perry Silver had become dissatisfied with the new owners of WIBG. He called Gene Kolber in the hope of becoming a full-time salaried employee of the Kolber agency but Gene Kolber rejected this proposal. Further discussions led to an agreement whereby Perry Silver would continue to work for the agency on the same terms as before but full-time and with provision of office facilities and a car. He was also assigned to work on certain in-house accounts as to which he would be compensated on the same terms as for his account referrals. Finally, it was agreed that Perry Silver would be given an accounting of commissions owed to him and would draw a weekly income against the sum due. Plaintiff then resigned from his position at WIBG.

The two men met on April 15, 1977 to determine how much money Kolber Advertising owed Perry Silver as of March 4, 1977. The document memorializing that occasion, which Gene Kolber wrote out during the meeting, calculates the total due as of that date to be $8,263.81. According to Gene Kolber this sum represented only a "ball park feel" of the amount of money involved in that he was "winging it right off the top of [his] head" when writing down the individual figures that comprise the sum. His purpose in doing this, he claims, was to demonstrate by "leaning over backwards" in the plaintiff's favor that the $1,000 per week draw requested by him was too high. The parties then agreed to a draw of $400 per week, which Perry Silver received until he left the agency in July, 1977 and bought a radio station of his own. The manner of and reasons for his departure from the agency are disputed but these matters are not relevant to the case.

The document in Gene Kolber's handwriting was typed out by an agency secretary on April 16, 1977. In addition to a list of accounts as to which the agency owed Perry Silver money and the amount for each account, the document states:

August & September ATCO DRAGWAY is still due Perry.

Kolber Advertising has out in bills—not yet paid Commission on:

| | |
|---|---|
| $2,866.77 | PIER 37 |
| 2,792.00 | ATCO |
| $5,658.77 | |

Upon collection, Perry Receives 50% of net on these 2 accounts.

Per other statement, *ATCO* is figured at $25.00/:60; $20.00/:30; $15.00/:10. Not paid to Perry on:

$ 273.00   ATOMS
  237.00
$ 916.00   JAMESTOWN FERRY (Kolber Advertising has not collect-
           ed on)

_____

Perry receives 50% net on:

BILLOW ELECTRIC SUPPLY        COLLAGE MAGAZINE        AMC ZONE
HERTZ                         STELL PIER             VAL PAK
WRANGLER–WRANCH               BF&T (SHELTER BAY & TOWERS)

ABINGTON AMC was paid in full but not fully collected by Kolber Advertising.

_____

According to the plaintiff, the term "net" was used by the parties to mean revenues earned from an account minus out of pocket expenses generated by it, such as the cost of radio air time; according to Gene Kolber, "net" was intended to signify revenues earned from an account minus all expenses attributable to it, including a pro rata share of in-house "cost of doing business" expenses. Gene Kolber also claims that Perry Silver failed to produce the type of client contemplated by their agreement, namely, clients who would purchase not only radio air time, but also advertising production services. Finally, Gene Kolber maintains that some of the clients that Perry Silver did produce failed to pay their agency bills, and that Perry Silver is presently indebted to Kolber Advertising for such losses. A description of the activities of the Kolber agency is necessary to illuminate these matters. The central issue in the case is the meaning of the contractual term "50% of net."

## II

Gene K. Kolber Advertising, Inc. offers a variety of marketing and public relations services to its clients. A significant portion of the agency's business arises from radio broadcasting, an industry in which Gene Kolber has worked for thirty-five years. In addition to producing advertisements for radio broadcast, the agency purchases quantities of radio air time, which may be bought from it at the same retail price as from the radio stations themselves. On the sale of this air time to agency clients who produce their own advertising, the agency earns a standard 15% commission, paid not by the client but the radio station. If the agency also produces the advertisement to be presented in the air time sold, this profit will be supplemented by whatever profits the agency may earn for services rendered. According to Lee J. Kartman, the Kolber agency's accountant and a longtime acquaintance of Gene Kolber's, markups on advertising production costs are high and profits earned in this facet of radio advertising "far outstrip" those earned in the simple resale of air time.

However, by engaging in "time bank" and barter deals, an agency can earn more than the standard 15% commission when it sells air time. The station manager of WYSP radio, Eugene Vassall, testified that profits lost to a station because its available air time remains unsold cannot be recouped in that air time cannot be saved, no more than hotel or flight space. Stations may thus be induced to offer discounts to buyers of air time, especially to agencies that buy large quantities of it for "burn off" at unspecified times during a period of months or years. In such arrangements, the station instead of selling air time, may barter it for needed goods or services, thereby funding present expenses with future "inventory." The extent of the discount to the agency will depend upon the ratio of the retail value of the air time received by the agency to that of the goods or services it barters away. The witness stated that the laws of supply and demand determine barter ratio

values and that they vary from an equal exchange to three-to-one in the agency's favor.

Thus, an agency can increase its profits by purchasing air time for its "time bank" during a period when barter ratio values favor air time buyers. Profits may be further increased by purchasing the goods and services to be bartered at less than their retail value. Eugene Vassall testified on cross-examination that a radio station is unaware of the cost to an agency of the goods or services it barters; for example, barter of a quantity of air time with a retail value of $2,000 for merchandise retailing at $1,000 would be regarded as a two-to-one trade by the station but would be a five-to-one trade for the agency if it had paid only $400 for the merchandise. Moreover, the agency might itself not have paid cash for the merchandise but have traded already accumulated air time to acquire it. Or, the agency might serve as a conduit in a barter contract between the station and the merchandiser. In either case, the advantages of barter to the merchandiser are like those enjoyed by the station. Presumably, barter ratio values in the exchange between the agency and the merchandiser are also determined by the laws of supply and demand. Any tax questions raised by barter practices are not relevant to this case.

An agency calculates profits earned from time bank and barter practices as follows. According to the testimony of Lee J. Kartman, gross profit earned on a transaction equals gross revenues generated by it minus the cost of the air time it uses up. In this calculation, the cost of air time is considered to be not the retail value of the goods or services that the agency bartered to acquire the air time, but the actual cost to the agency of those goods or services; in the example given above, the cost of air time to the agency would be $400, not $1,000.

The net profit earned on a transaction, both Lee J. Kartman and Gene Kolber testified, equals the gross profit earned on the transaction minus a pro rata share of so-called "general and administrative" expenses. That is, all of the expenses not associated with any particular transaction must be added together and a pro rata percentage of this sum be allocated to each and every transaction. According to Lee J. Kartman, general and administrative expenses typically amount to 25% and 35% of an agency's gross billings and include, *inter alia*, executive and other employee salaries. In this regard, the witness testified that within his experience, which includes work at three advertising agencies, the commission earned by a salesperson in the advertising agency business amounts to 20 to 30% of the gross profits earned by the agency on the salesperson's accounts.

Turning to the practices of the Kolber agency in particular, Eugene Vassall testified that its strong involvement in the barter business was well known and that a trade with the Kolber agency was always at a ratio of more than one-to-one in the agency's favor. According to Gene Kolber himself, while the barter business accounts for approximately one-third of the agency's operations, advertising production activities are the primary source of agency profits. Total agency profits or losses were not introduced in evidence but Lee J. Kartman testified that gross billings over a five-year period were $4,461,000 and that general and administrative expenses amounted to 31% of this figure. In the exhibits introduced in evidence by the defendants these expenses are allocated to the plaintiff's accounts by application of a simple formula: gross billings for each account are multiplied by one-third and the resulting figure is subtracted from the gross profits earned by that account. In this regard Lee J. Kartman testified that general and administrative expenses are always allocated as a whole and never divided between the retail and production aspects of the agency's business.

As noted above, general and administrative expenses include employee salaries. According to Lee J. Kartman, the agency paid Gene Kolber a salary of $60,000 in 1980, a year in which general and adminis-

trative expenses totaled $320,000. However, Lee J. Kartman did not know or could not recall the "compensation structure" incorporated into the plaintiff's contract of employment or the contracts of the eight or nine other sales personnel who have worked for the Kolber agency. As to this matter, Gene Kolber stated that all of the agency's sales personnel have worked on the same terms as did Perry Silver, that is, no salary and 50% of net in commission, and that it was customary in the industry for sales personnel to share in losses generated by accounts that they introduced to an agency. He also testified that Kolber agency personnel could not enter into a contract with a client nor place an advertisement without his, Gene Kolber's, prior approval.

The matter in dispute between the parties to this action may now be stated precisely; 1) Does the term "50% of net" as used by the parties refer to gross profits or net profits, as these terms are defined above? 2) What was the cost to the Kolber agency of the air time sold by Perry Silver in light of the time bank and barter transactions in which the agency engaged? 3) Must Perry Silver share in losses sustained by the agency on accounts that he introduced to it? 4) Was Perry Silver contractually obligated to bring into the Kolber agency clients who purchased not only air time but also advertising production services? These and subsidiary matters will be resolved after a statement of the applicable law.

### III

■ Under Pennsylvania law, "[t]he cardinal rule of contract construction is that the intent of the parties at the time they contracted is controlling." *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1271 (3d Cir. 1979), *citing Kennedy v. Erkman*, 389 Pa. 651, 655, 133 A.2d 550, 552 (1957). If the language of the contract is "clear and unambiguous," the intent of the parties is determined exclusively from the written instrument by the court. *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d at 1271, *citing Kennedy v. Erkman, supra; Pines Plaza Bowling, Inc. v. Ross*- (1958). But if the language of the contract

is ambiguous in the opinion of the court, parol or extrinsic evidence may be admitted and it is for the jury to resolve the ambiguities and determine the parties' intent. *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d at 1271, *citing In re Herr's Estate*, 400 Pa. 90, 94, 161 A.2d 32, 34 (1960); *Easton v. Washington County Insurance Co.*, 391 Pa. 28, 35–36, 137 A.2d 332, 336 (1957); *Kennedy v. Erkman, supra; Castellucci v. Columbia Gas, Inc.*, 226 Pa.Super. 288, 292, 294, 310 A.2d 331, 333, 334 (1973).

■ Applying these principles to the facts of the present case, the court holds that the term "50% of net" is ambiguous within the context of the agreement between the parties and finds, on the basis of the credible trial evidence, that the plaintiff's understanding of the term expresses the contractual intent of the parties. In reaching this conclusion, the court has been guided by the statement of the Pennsylvania Supreme Court that

if the language of the contract is ambiguous and susceptible of two interpretations, one of which makes it fair, customary and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not likely enter into, the constructions which make it rational and probable must be preferred. (citations omitted).

*Frickert v. Deiter Brothers Fuel Co.*, 464 Pa. 596, 601, 347 A.2d 701, 704 (1975), *quoting Consolidated Tile & Slate Co. v. Fox*, 410 Pa. 336, 339, 189 A.2d 228, 229–30 (1963).

Turning to the evidence, the document of April 15, 1977 in Gene Kolber's handwriting does not in any way mention general and administrative expenses. Rather, it states without qualification: "We owe Perry all deals to date: 7,597.81 + 666. July Atco = $8,263.81." Correcting a simple error in addition on the document raises the total to $9,767.81. This figure, it will be recalled, was intended to give Perry Silver a "ball park feel" of the amount of money owed to him by Kolber Advertising as of March 4, 1977. But under the calculations the defendant presented at trial, in which general

and administrative expenses in the amount of one-third of gross billings have been deducted from gross profits, the maximum amount owed to the plaintiff as of that date was $5,239.11, approximately one-half of the sum mentioned on the document. The difference between the two figures is too great for them to be in the same "ball park," especially in light of the fact that Perry Silver was to receive no compensation from the agency other than the commissions he earned. Hence, the blunt statement of indebtedness on the document cannot be construed as an attempt to give notice of likely earnings, but rather according to its plain meaning. As such the figures tally more closely with the plaintiff's contentions.

Thus, as to the Atco Dragway account the document states that Perry Silver's commissions were $684.00, $504.00, and $666.00, for a total of $1,854.00. Gross billings on the Atco account through March 4, 1977 were $7,107.00. According to the document cost of air time for Atco spots was to be "figured at $25.00/:60 [seconds]; $20.00/:30 [seconds]; [and] $15.00/:10 [seconds]". At these rates total cost of air time through March 4, 1977 was $2,910.00. Subtracting cost of air time from gross billings results in a gross profit figure of $4,197.00. Fifty percent of this equals $2,098.50, which is in the same "ball park" with the Atco commissions listed on the document. Defendant's calculations as to the same account result in a commission to Perry Silver of less than $80.00.

At trial Gene Kolber stated that he explained to Perry Silver that a deduction for general and administrative expenses would be subtracted from his commissions, but the court resolves the issue of credibility in the plaintiff's favor.

■ The court also finds for the plaintiff as to the effect of barter ratio values on the agency's air time costs. The actual cost to the Kolber agency of the items bartered for air time were peculiarly within the knowledge of the Kolber agency. Under a traditional rule of evidence, a litigant is not required to establish facts "peculiarly within the knowledge of his adversary," *Jean-*

*nette Corp. v. N.L.R.B.*, 532 F.2d 916, 919 n. 4 (3d Cir. 1976), *citing Campbell v. United States*, 365 U.S. 85, 96, 81 S.Ct. 421, 427, 5 L.Ed.2d 428, 437 (1961). Hence the Court accepts the two-to-one barter ratio value where pertinent.

■ Furthermore, the evidence is contrary to defendant's assertion that Perry Silver breached his contract by not bringing in sufficient clients who purchased not only air time but also advertising production services, so-called "full service clients." During the deposition of Gene Kolber by plaintiff's counsel on October 23, 1979, the following exchange took place:

Q: What exactly was [Perry Silver] to do for you?

A. [by Gene Kolber] What he suggested he would do for me was to try to bring in accounts that would become full service clients of the agency, or media buyers of the agency.

Q: Would he do anything with regard to your time bank?

A: Yes, he would try to sell out the time bank.

Deposition of Gene Kolber, 10–11. If the number of "full service clients" brought in by the plaintiff was insufficient, defendant might have dismissed him, but having accepted accounts that proved to be air time buyers only, defendant could not deprive the plaintiff of the commissions due to him on those sales.

■ However, there is merit in the defendant's claim that Perry Silver should share in losses accruing to the agency on certain accounts referred to it by him. On April 14, 1978, Perry Silver wrote to Gene Kolber that

Just as I agreed that I should share in the loss of [sic] Pier 37, so should you share in the loss of [sic] the Atoms and Jamestown Ferry . . . .

If you will re-read my March 20, 1978 letter, I made reference to not only the loss of [sic] Pier 37, but also to Pierce & Pierce. I do not want anything that I am not entitled to. If you have not been paid, then I do not expect to be paid. I also expect to share in 50% of the loss.

Appropriate deductions will thus be made from plaintiff's recovery for any such losses sustained by the agency. However, defendant's calculations of the amount of the deduction is unacceptable. As to Pierce & Pierce, it proceeds as follows:

| Gross billings | | $3,420.00 |
|---|---|---|
| Cost of media | $2,150.00 | |
| Legal fees | 844.05 | |
| | $2,994.05 | ($2,994.05) |
| Gross profits | | $ 425.95 |
| G&A allocated $1,140.00 | | ($1,140.00) |
| Loss | | ($ 714.05) |
| Total uncollected | | ($3,420.00) |
| Net loss | | ($4,134.05) |
| Perry Silver share | | ($2,067.03) |
| Defendant's share | | ($2,067.03) |

In this calculation defendant has deducted general and administrative expenses (G&A) and, as heretofore found, the evidence does not sustain such deductions. Furthermore, there is no basis for the defendant's claim of lost profits. The court finds that the plaintiff should pay one-half of the out-of-pocket losses only. As the cost of media must be reckoned at one-half of the defendant's figure, the total loss to be shared is $1,919.05 and plaintiff's share thereof is $959.53. By similar adjustments, plaintiff's share in the loss sustained by the Pier 37 account is reduced from $2,642.82 to $1,192.20. The Court finds that plaintiff has no obligation to share in losses on other accounts.

Totaling all of the claims asserted by the plaintiff and counterclaims asserted by the defendant, including the losses discussed above, the Court finds that the defendant owed the plaintiff $16,139.18 under their contract. It is undisputed that Perry Silver has already been paid $9,400.00; consequently $6,739.18 is still owed to him.

Plaintiff's claim for this sum was liquidated as of July, 1977. Under Pennsylvania or federal law, "[i]f a claim is liquidated, the party whose payment or money has been withheld is entitled to prejudgment interest as a matter of right from the time the money became due or payable." *Sun Shipbuilding & Dry Dock Co. v. United States Lines, Inc.*, 439 F.Supp. 671, 675 (E.D.Pa.1977), *aff'd mem.*, 582 F.2d 1276 (3d Cir. 1978), *cert. denied*, 439 U.S. 1073, 99 S.Ct. 846, 59 L.Ed.2d 40 (1979) (citations omitted). Plaintiff is thus entitled to interest on the sum of $6,739.18 from July, 1977 to date. Calculated at the legal rate of 6%, the amount of interest owed to the plaintiff is $1,617.40, for a total recovery in the amount of $8,356.58.

This court will enter an order awarding the plaintiff $8,356.58.