473 A.2d 584

DASET MINING CORPORATION, a Pennsylvania Corporation, Jacobs Contracting Corporation, a Pennsylvania Corporation, Tased Coal Sales, Inc., a Pennsylvania Corporation, Armstrong Land Company, Inc., a Pennsylvania Corporation, Seven Sisters Mining Company, Inc., a Pennsylvania Corporation, and Jacobs, Jacobs & Jacobs, a Partnership Composed of Seaborn Jacobs, Terrence Jacobs, and Darryl Jacobs

v.

INDUSTRIAL FUELS CORPORATION, a Delaware Corporation, Peoples Energy Corporation, a Corporation, and Twin Oaks Coal Company, a Delaware Corporation, Appellants.

DASET MINING CORPORATION, a Pennsylvania Corporation, Jacobs Contracting Corporation, a Pennsylvania Corporation, Tased Coal Sales, Inc., a Pennsylvania Corporation, Armstrong Land Company, Inc., a Pennsylvania Corporation, Seven Sisters Mining Company, Inc., a Pennsylvania Corporation, and Jacobs, Jacobs & Jacobs, a Partnership Composed of Seaborn Jacobs, Terrence Jacobs and Darryl Jacobs, Appellants,

v.

INDUSTRIAL FUELS CORPORATION, a Delaware Corporation, Peoples Energy Corporation, a Corporation, and Twin Oaks Coal Company, a Delaware Corporation.

TWIN OAKS COAL COMPANY, a Delaware Corporation,

v.

DASET MINING CORPORATION, a Pennsylvania Corporation, Jacobs Contracting Corporation, a Pennsylvania Corporation, Tased Coal Sales, Inc., a Pennsylvania Corporation, Armstrong Land Company Inc., a Pennsylvania Corporation, Jacobs, Jacobs & Jacobs, a Partnership, Seaborn Jacobs, Terrence S. Jacobs, Darryl M. Jacobs and Martha R. Jacobs, Appellants.

TWIN OAKS COAL COMPANY, a Delaware Corporation, Appellant,

v.

DASET MINING CORPORATION, a Pennsylvania Corporation, Jacobs Contracting Corporation, a Pennsylvania Corporation, Tased Coal Sales, Inc., a Pennsylvania Corporation, Armstrong Land Company, Inc., a Pennsylvania Corporation, Seven Sisters Mining Company, Inc., a Pennsylvania Corpora-

tion, Jacobs, Jacobs & Jacobs, a Partnership, Seaborn Jacobs, Terrence S. Jacobs, Darryl M. Jacobs and Martha R. Jacobs.

Superior Court of Pennsylvania.

Argued May 24, 1983.

Filed March 2, 1984.

Petition for Allowance of Appeal Denied July 2, 1984.

16

18

---

David B. Fawcett, Jr., Pittsburgh, for Daset, etc., appellants (at Nos. 753 and 754) and appellees (at No. 634 and 648).

Frederick J. Francis, Pittsburgh, for Industrial Fuels, appellant (at No. 634) and appellee (at No. 753) and for Twin Oaks, appellant (at No. 648) and appellee (at No. 754).

Before CAVANAUGH, ROWLEY and CIRILLO, JJ.

CIRILLO, Judge:

This breach of contract case is really two cases, which were consolidated for trial, because they relate to the same factual situation and legal conflicts among the parties. In the Spring of 1980, Twin Oaks Coal Company (hereinafter "Twin Oaks") instituted an action in trespass and assumpsit in the Common Pleas Court of Allegheny County against Daset Mining Corporation, Jacobs Contracting Corporation, Tased Coal Sales, Inc., Armstrong Land Company, Inc., Seven Sisters Mining Company, Inc., Jacobs, Jacobs & Jacobs; a partnership composed of Seaborn Jacobs, Terrence S. Jacobs, Darryl M. Jacobs, and Martha Jacobs (hereinafter all referred to collectively as "Daset"). On June 3, 1980, Daset filed in Westmoreland County, a complaint in Assumpsit and Trespass against Twin Oaks, Industrial Fuels Corporation ("IFC"), and Peoples Energy Company (hereinafter "Peoples").[1] The case in Westmoreland County was subsequently transferred to Allegheny County and the two were consolidated. B.H. & H., Inc. was brought in as an additional defendant by Daset.

Greatly simplified, the basic facts underlying the controversy are that Twin Oaks purchased the coal-related assets of Daset, which were mainly a large number of coal leases and some strip mining equipment. The sale was consummated with a lengthy integrated agreement dated April 11, 1979. The contract stipulated that Twin Oaks was to pay Daset $3,405,026.00 and assume some of Daset's outstanding obligations. These included the reclamation of some stripped land, which had not yet been performed by Daset and the remaining payment owed by Daset to B.H. & H. The greater part of the equipment and many of the coal leases had been previously acquired by Daset from B.H. & H. At the time that the agreement was executed, Twin Oaks paid $2,405,026.00, and gave Daset a note for the

---

1. Peoples owns all of the stock of IFC; IFC owns all of the stock of Twin Oaks. Peoples, IFC, and Twin Oaks shall be collectively referred to as "Twin Oaks".

remaining million, which was payable a year later.[2] Shortly before the due date of the note, Twin Oaks refused to pay Daset and B.H. & H. because of a number of legal grievances against Daset. Subsequently, Twin Oaks filed suit on the basis that there was a breach of the important warranty given by Daset in the agreement of April 11, 1979; namely, that the lands assigned to Twin Oaks by Daset, contained not less than four million (4,000,000) tons of recoverable bituminous coal. Daset filed suit for non-payment of the note and took the position that there was no such breach; but brought B.H. & H. into the case on the theory that if there was such a breach, it would be partly the responsibility of the latter because a number of the coal leases had been acquired from it.

At the trial, Twin Oaks did not elect to prosecute any claim against Daset except this important alleged breach of the warranty of four million (4,000,000) tons of coal. In addition, it alleged that this breach created a right to recover for the loss of tonnage and for its great expenditures for reclamation of stripped land.[3]

**2.** The section of the contract dealing with payment stated as follows:
3. (B)(iii) The remaining balance of One Million ($1,000,000.00) Dollars shall be paid on or before one year from the date hereof, together with interest on the balance remaining unpaid from time to time at the rate of six percent (6%) per annum, which obligation shall be evidenced by a non-negotiable promissory note in the form set forth in Schedule E (attached hereto and by reference made a part hereof).

**3.** The trial judge ruled that the contract precluded recovery of reclamation costs. He did so on the basis that under INDEMNIFICATION, Paragraph 2 of the agreement stated as follows:
Therefore, the parties hereto agree that to the extent there are less than four million tons of recoverable bituminous coal, sellers and warrantors jointly and severally agree to promptly reimburse Buyer in the amount of One Dollar ($1.00) per ton for each ton less than Four Million (4,000,000) tons of recoverable bituminous coal existing on, in and under the lands described in the leases listed in Section 1 of Exhibit I to the Assignment Agreement (Schedule G hereto). It is agreed by Buyer and Sellers that such sum shall be paid as liquidated damages ("Liquidated Damages") for the breach of the representations and warranties set forth in said paragraph 17 of Article IV.

After a lengthy jury trial, the judge submitted interrogatories to the jury. The jury found that the lease-holds sold to Twin Oaks by Daset contained four million (4,000,000) or more tons of recoverable bituminous coal as defined in the agreement. This resulted in verdicts against Twin Oaks and in favor of Daset in the amount of $1,394,892.86, and in favor of B.H. & H. in the amount of $598,701.60. Twin Oaks filed a motion for a new Trial, and Daset filed a limited motion for a new trial on the ground that the court should not have restricted its claim for interest to six percent (6%). B.H. & H. settled and has discontinued. The motions of the parties were denied and both parties appealed. We will address their claims seriatim.

As a foundation for the discussion of the parties' claims, we turn our attention to the contract. This comprehensive agreement, which embodies the rights and obligations of the parties, is a lengthy document, which was thoroughly negotiated prior to its execution on April 11, 1979. However, the controversy now before us revolves around only those certain passages, which deal with the warranty made by Daset, which state as follows:

That on, in and under the lands described in those leases listed in Section 1 of Exhibit I to the Assignment Agreement (Schedule G hereto), and which leases are effectively assigned to Buyer on the date hereof in the title condition required by this Agreement (and not subject to those exceptions or conditions that may be specified on Schedule L attached hereto), there are not less than Four Million (4,000,000) tons of recoverable bituminous coal.

In addition, the definitions section of the agreement defines the term "recoverable bituminous coal" as follows:

Whenever used in this Agreement, the term "recoverable bituminous coal" shall mean bituminous coal that, as of the date hereof, can be mined and removed with the use of modern mining methods considering the generally accepted maximum stripping ratios in the area in which Sellers have conducted their mining operations.

**Admission of Evidence.**

■ The appellant, Twin Oaks', initial contention concerns the admission of various documents and other evidence, which it asserts were irrelevant and prejudicial.[4] More specifically, Twin Oaks alleges that the admission of any testimony beyond the scope of the issue of whether there were four million (4,000,000) tons of "recoverable bituminous coal", as defined in the agreement, is grounds for reversal because it tended to divert the jury from the issue and confused or misled them.

■ A trial court may properly exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury. *U.S. v. Hively,* 547 F.Supp. 318 (M.D.Pa.1982); *Belmont Industries, Inc. v. Bethlehem Steel Corp.,* 62 F.R.D. 697 (1974), affirmed 512 F.2d 434 (3 Cir.1975); *Short v. Allegheny Trust Co.,* 330 Pa. 55, 198 A. 793 (1938); *Whistler Sportswear, Inc. v. Rullo,* 289 Pa.Super. 230, 433 A.2d 40 (1981). However, "prejudice" for the purposes of this rule, does not mean detrimental to a party's case, but rather, an undue tendency to suggest a decision on an improper basis. *Whistler, supra.* In Pennsylvania, the trial judge has broad discretion regarding the admission of potentially misleading and confusing evidence. *Bowers v. Garfield,* 382 F.Supp. 503 (E.D.Pa.1974), affirmed 503 F.2d 1398 (3 Cir.1974).

■ Appellant alleges error in the admission of three documents. The first document was a memorandum, dated

4. The appellee argues that most of Twin Oaks contentions on the basis of relevancy and prejudice have been waived because the only objections made at trial were on the basis of the Parol Evidence Rule, and some of these issues were not raised in post-trial motions. Issues not raised in post-trial motions in the trial court are not preserved for consideration on appeal. *O'Malley v. Peerless Petroleum Inc.,* 283 Pa.Super. 272, 423 A.2d 1251 (1980). In appellant's Motion for New Trial, it is asserted that the trial judge erred in allowing evidence to be given concerning negotiations prior to the agreement of April 11, 1979. Many of the specific issues raised on appeal would be characterized as negotiations. Therefore, we decline to find all of appellant's allegations waived.

March 27, 1979, from the Treasurer of Peoples to the chairman of the Board of Peoples. A portion of it entitled *Reserves* stated, "In place reserves of bituminous seam coal are estimated to exceed 6,000,000 tons." A second memorandum, dated February 26, 1979, stated, "I concur with their reserve [Daset's] estimate of 5.5 million raw tons in place contained in a total of 4,107 surface acres ...".[5] The court also admitted another document which showed that the appellant allocated the write off of the mineral rights of the coal leases using a figure of six million two hundred thousand (6,200,000) tons.

Appellant argues that because these documents all mentioned amounts of coal in excess of that warranted, they were highly prejudicial and as such had a tendency to compel an improper decision. Further, Twin Oaks asserts that this testimony was irrelevant because neither estimates of coal reserves or in place coal nor "write off figures" are germane to the warranty of the amount of "recoverable bituminous coal", as defined in the agreement. Twin Oaks further contends that these figures all included "deep mined coal", which the trial court ruled was not included in the warranty made by Daset.

■ Regarding the admission of these documents, we fail to see how they prejudiced the appellant's case. The trial judge clearly ruled that the amount of coal that was being warranted was no less than four million (4,000,000) tons. He also ruled that coal reserves that could be mined by deep mining methods were excluded, as is evidenced by the following discussion:

MR. MCGINLEY: Judge, what about coal that could be deep mined as well as stripped?

5. Appellant also raises the issue of the competency of the individuals who made these estimates. However, no such objection was raised at trial or in post-trial motions. Matters raised for the first time on appeal will not be considered. *Gibson v. Miller*, 265 Pa.Super. 597, 402 A.2d 1033 (1979); *Mawhinney v. Hotzhauer*, 168 Pa.Super. 283, 77 A.2d 734 (1951); *Zoni v. Mutual Life Ins. Co. of New York*, 153 Pa.Super. 1, 33 A.2d 445 (1943); *Stevens et al. v. Frank et al.*, 151 Pa.Super. 222, 30 A.2d 161 (1943).

THE COURT: What I have said I don't think has anything to do with that. A person may elect to mine coal by the deep mining method but for the purposes of the warranty and shall I say this sale of coal, I'm ruling that it was contemplated a minimum of four million tons of coal susceptible of being mined by stripping.

MR. MCGINLEY: As long as I understand the Court to beholding (sic) that the danger in the case, Judge, and what we're just trying to set forth was that if some of these mines which could have been stripped had been deep mined, that coal would have accounted for the warranties.

THE COURT: Well, it didn't happen. So, we're not faced with that.

MR. SMITH: But as I understand your ruling, Your Honor, if that particular coal that Mr. McGinley is referring to could not be stripped, then that coal which could on the other hand been deep mined, that coal is not included in the warranty; is that correct?

THE COURT: That's correct.

Further, when the estimates of coal reserves were introduced, Judge Weir overruled appellant's objections on the basis that they were admissions of the appellant that were relevant "to how much [coal] is there". At no time was this evidence purported to be estimates of the amount of coal reserves covered by the contract warranty. This testimony did not indicate the amount of "recoverable bituminous coal", which could be obtained by strip mining, but only established that the appellant estimated that there was a certain amount of coal contained in, on and under the lands in question. As to the testimony which concerned the figure used by the appellant in preparing its taxes; at no time during the testimony was there any suggestion that the figure used for depletion of these coal reserves had any correlation to the amount of coal warranted.[6] In addition,

6. Appellant also argues that the admission of this document could have led the jury to believe that it cheated on its taxes. We find such a contention extreme. At no time was such a suggestion made nor

when the jury was charged, the judge reiterated that the figure to be considered in determining breach of the warranty was four million (4,000,000) tons and provided the jury with a copy of the definition of "recoverable bituminous coal" to use during its deliberations. Therefore, we fail to see how, under the circumstances, any confusion could have resulted from the admission of this testimony.

 Appellant next contends that it was improper to permit testimony concerning Twin Oaks' financial condition and operations after the agreement was executed by the parties.[7] The trial court permitted this testimony because it determined that it was relevant to the appellant's motive for not paying the monies owed. Asserting that evidence of motive is irrelevant in an action for breach of warranty, appellant cites *Seneca Falls Machine Co. v. McBeth,* 246 F.Supp. 271 (W.D.Pa.1965), vacated and remanded 368 F.2d 915 (3 Cir.1966); *Otto v. Imperial Casualty & Indemnity Co.,* 277 F.2d 889 (8 Cir.1960); and *Lane v. Bisceglia,* 15 Ariz.App. 269, 488 P.2d 474 (1971).

In *Seneca Falls Machine Co.,* the Federal District Court, applying Pennsylvania law, held that the reasons for terminating an oral contract were irrelevant when no provision was made in the contract for termination. The court then concluded that the contract could be terminated by either

was there any inference that that was the purpose for using the 6.2 million ton figure for write-off purposes.

7. Appellant also contends that the trial court erred in admitting evidence of Twin Oaks expectation of profit and motives for entering into the agreement. We have carefully reviewed the record and appellant's motion for a new trial. This issue was never raised prior to the appeal to this Court. A party may not raise an issue for the first time on appeal. *Vend-A-Matic, Inc. v. Frankford Trust Co.,* 296 Pa.Super. 492, 442 A.2d 1158 (1982); *Gibson v. Miller,* 265 Pa.Super. 597, 402 A.2d 1033 (1979); *Mazza v. Berlanti Const. Co.,* 206 Pa.Super. 505, 214 A.2d 257 (1965); *Robinson v. Brown,* 195 Pa.Super. 384, 171 A.2d 865 (1961). Additionally, a reason for new trial not assigned as error in the court below may not be raised and will not be considered for the first time on appeal. *Risbon v. Cottom,* 387 Pa. 155, 127 A.2d 101 (1956); *Schneider v. Albert Einstein Medical Center, Northern Division,* 257 Pa.Super. 348, 390 A.2d 1271 (1978); *Baccare v. Mennella,* 246 Pa.Super. 53, 369 A.2d 806 (1976). Therefore, we find that appellant has waived this contention.

party at will or after a reasonable time. In *Otto* the appellant-agent attempted to recover punitive damages from the appellee-insurance company in an action for breach of contract. The court held that, under Missouri law, punitive damages are not recoverable in a breach of contract action. The appellant had attempted to circumvent this rule, by alleging that appellee's termination of the contract was malicious and willful. The court held that, "... [T]he motive of one *who has the right* to terminate a contract at any time is immaterial ..." *Id.* at 893, 894. (Emphasis supplied). In *Lane,* the parties entered an agreement for the sale of a property, which was conditioned upon the purchasers being able to assume the existing mortgage at a six percent (6%) interest rate. When the mortgagee would only permit the assumption at a six and three-quarter percent (6¾%) interest rate, the buyers refused to purchase the property and the seller retained the $5,000.00 earnest money on deposit. The purchasers then brought suit to recover the money. The court held that the seller materially breached the contract by not providing the purchasers with the mortgage at the agreed rate. Thus, the purchasers' motive for rescinding the contract was immaterial.

As the appellee, Daset, correctly counters in its brief, these cases are inapposite to the case at bar because they concern the exercise of a contractual right; not the breach of a duty to pay. In the instant case, Twin Oaks neither had a contractual right to terminate the contract nor to refuse to pay the monies owed. In fact, its refusal to pay was in derogation of the terms of the contract, which did provide the remedy in the event that the amount of recoverable bituminous coal was less than the four million (4,000,-000) tons warranted. This remedy, which was properly alleged at trial, was provided in Article VII, paragraph two, which states:

2. With respect to the representations and warranties set forth in paragraph 17 of Article IV above [recoverable bituminous coal], it is acknowledged and agreed by the

parties hereto that the truth and accuracy thereof is of the essence of this Agreement and that the damages that would be incurred by Buyer in the event that said representations and warranties were untrue in any respect would be extremely difficult to measure and determine. Therefore, the parties hereto agree that, to the extent there are less than Four Million (4,000,000) tons of recoverable bituminous coal, Sellers and Warrantors jointly and severally agree to promptly reimburse Buyer in the amount of One Dollar ($1.00) per ton for each ton less than Four Million (4,000,000) tons of recoverable bituminous coal existing on in and under the lands described in the leases listed in Section 1 of Exhibit I to the Assignment Agreement (Schedule G hereto). It is agreed by Buyer and Sellers that such sum shall be paid as liquidated damages ("Liquidated Damages") for the breach of the representations and warranties set forth in said paragraph 17 of Article IV.

As stated previously, the trial judge has broad discretion regarding the admission of potentially misleading and confusing evidence. *Bowers, supra.* This trial was a lengthy proceeding with a great number of witnesses, many exhibits and extensive testimony. In reviewing the entire record, we can neither say that the trial judge erred in admitting any of this evidence nor that its admission constituted an abuse of discretion such that the court's judgment was manifestly unreasonable or the result of partiality, prejudice, bias or ill will. *Commonwealth ex rel. Berman v. Berman,* 289 Pa.Super. 91, 432 A.2d 1066 (1981); *Straub v. Tyahla,* 274 Pa.Super. 411, 418 A.2d 472 (1980). Also in the aggregate, we cannot say that if this testimony had been excluded, it would have changed the outcome of the case. *See, Redevelopment Authority of City of Chester v. Bosacco,* 46 Pa.Cmwlth. 242, 406 A.2d 1163 (1979), appeal after remand 53 Pa.Cmwlth. 550, 417 A.2d 1350 (1980).

**Parol Evidence**

Appellant next contends that the trial court erred by permitting the introduction into evidence of prior negotia-

tions and agreements. Twin Oaks argues that the admission of such testimony was highly prejudicial and improper; and was in violation of the parol evidence rule because the agreement contained an integration clause. The Restatement (Second) of Contracts § 213 explains the effect of such a clause as follows:

**§ 213. Effect of Integrated Agreement on Prior Agreements (Parol Evidence Rule)**

(1) A binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them.

(2) A binding completely integrated agreement discharges prior agreements to the extent that they are within its scope.

(3) An integrated agreement that is not binding or that is voidable and avoided does not discharge a prior agreement. But an integrated agreement, even though not binding, may be effective to render inoperative a term which would have been part of the agreement if it had not been integrated.

However, Section 214 of the Restatement (Second) also ennumerates the limited circumstances in which evidence of prior or contemporaneous agreements and negotiations may be admitted as follows:

**§ 214. Evidence of Prior or contemporaneous Agreements and Negotiations**

Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish

(a) that the writing is or is not an integrated agreement;

(b) that the integrated agreement, if any, is completely or partially integrated;

(c) *the meaning of the writing whether or not integrated;*

(d) illegality, fraud, duress, mistake, lack of consideration, or other invalidating cause;

(e) ground for granting or denying rescission, reformation, specific performance, or other remedy. (emphasis supplied)

Comment b. states as follows:

 *b. Interpretation.* Words, written or oral, cannot apply themselves to the subject matter. *The expressions and general tenor of speech used in negotiations are admissible to show the conditions existing when the writing was made, the application of the words, and the meaning or meanings of the parties.* Even though words seem on their face to have only a single possible meaning, other meanings often appear when the circumstances are disclosed. In cases of misunderstanding, there must be inquiry into the meaning attached to the words by each party and into what each knew or had reason to know. *See* § 201. (emphasis supplied)

 It is well settled in Pennsylvania law that in the absence of fraud, accident or mistake, parol evidence as to preliminary negotiations or oral agreements is not admissible in evidence if it adds to, modifies, contradicts or conflicts with the written agreement between the parties. *Servomation Mathias Pa., Inc. v. Lancashire Hall, Inc.,* 442 Pa. 602, 276 A.2d 547 (1971); *Nicolella v. Palmer,* 432 Pa. 502, 248 A.2d 20 (1968); *Keyser v. Margolis,* 422 Pa. 553, 223 A.2d 13 (1966). However, it is equally well settled that this general rule does not apply where the agreement is ambiguous. In such a situation parol evidence is admissible to explain the agreement and resolve ambiguities to ascertain the meaning of the parties. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001 (1980 3rd Cir.); *Silver v. Gene K. Kolber Advertising, Inc.,* 518 F.Supp. 939 (E.D.Pa.1981); *In Re Fessman's Estate,* 386 Pa. 447, 126 A.2d 676 (1956); *Pavlich v. Ambrosia Coal Co.,* 441 Pa. 210, 273 A.2d 343 (1971); *Kohn v. Kohn,* 242 Pa.Super. 435, 364 A.2d 350 (1976). In addition, our Supreme Court has held that, "[T]he parol evidence rule does not apply in its ordinary strictness where the existence of a custom or usage to explain the meaning of words in a writing is

concerned." *Electric Reduction Co. v. Colonial Steel Co.*, 276 Pa. 181, 186, 120 A. 116, 118 (1923). "... [W]here terms are used in a contract which are known and understood by a particular class of persons in a certain special or peculiar sense, evidence to that effect is admissible, for the purpose of applying the instrument to its proper subject-matter." *Id.*, 276 Pa. at 188, 120 A. at 118. *Accord, Easton v. Washington County Insurance Co.*, 391 Pa. 28, 137 A.2d 332 (1957). In *Carter v. Edwin J. Schoettle Co.*, 390 Pa. 365, 134 A.2d 908 (1957), the court held that where there is an integrated agreement, evidence of prior negotiations is inadmissible to show an intent at variance with the language of the written agreement, but *is* admissible to show local usage, which would give a particular meaning to the language.

■ Appellant concedes in its brief that an agreement may be interpreted in accordance with "relevant usage" and cites the Restatement (Second) of Contracts § 220, which states as follows:

§ 220. Usage Relevant to Interpretation

(1) An agreement is interpreted in accordance with a relevant usage if each party knew or had reason to know of the usage and neither party knew or had reason to know that the meaning attached by the other was inconsistent with the usage.

(2) When the meaning attached by one party accorded with a relevant usage and the other knew or had reason to know of the usage, the other is treated as having known or had reason to know the meaning attached by the first party.

As the learned Judge Weir stated in his opinion, unless an individual had prior exposure to strip mining, it would be impossible to understand the correct meaning of such a simple term as "stripping ratios". Thus, without explanatory testimony the jurors would be unable to determine what if any meaning the parties attached to various terms. Testimony in the record revealed that both parties accorded the same meaning to the term "generally accepted maximum

stripping ratios". However, Twin Oaks contends that the admission of other extrinsic evidence concerning prior negotiations or drafts of the agreement to define local usage was improper. We disagree.

The contract in the case at bar concerns an industry that is highly technical in nature and the attendant terms employed by the parties have no meaning to individuals who are not acquainted with coal mining and therefore have no understanding of the terminology employed by those involved in the business. Moreover, because of the significance attached to various pivotal phrases in the agreement it was of great importance for the jury to hear testimony on how the terms were negotiated. This testimony would then provide sufficient background for evaluation of the intent of the parties in employing the particular language used.

Furthermore, the Restatement (Second) of Contracts § 212 provides for the interpretation of an integrated agreement as follows:

§ 212. Interpretation of Integrated Agreement

(1) The interpretation of an integrated agreement is directed to the meaning of the terms of the writing or writings in the light of the circumstances, in accordance with the rules stated in this Chapter.

(2) A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence. Otherwise a question of interpretation of an integrated agreement is to be determined as a question of law.

c. *Statements of intention.* The rule of Subsection (1) permits reference to the negotiations of the parties, including statements of intention and even positive promises, so long as they are used to show the meaning of the writing.

In support of its argument, Twin Oaks cites a number of cases in which prior drafts and negotiations were ruled inadmissible. However, these cases are inapposite to the

case at bar because they all involve situations where the proffered testimony contradicted or attempted to add terms to the agreement. In both *Carter, supra* and *National Cash Register, supra,* the parties attempted to introduce evidence which would have contradicted or changed the terms of the agreements. In *Fischer & Porter Co. v. Porter,* 364 Pa. 495, 72 A.2d 98 (1950), the Supreme Court held that it was improper to admit testimony, which would create an ambiguity where none existed. The situations in these cases are not at all analagous to that in the case at bar. None of the disputed testimony contradicted or varied the terms of the finalized agreement, but only served to illuminate the intent of the parties in utilizing the specific language which was finally incorporated into the contract. Mr. McGinley, the lawyer who had been involved in negotiating the contract on behalf of Daset, testified about terms that had been rejected and the reasoning behind the language actually used as follows.

Q. All right. So, that eliminated the language of economically marketable; is that correct?

A. Yes.

Q. Okay.

A. In the context of the negotiations, it was defined further in that there was a handwritten note, "minable and merchantable bituminous coal shall mean bituminous coal that when reached in the course of mining operations, can be mined and removed with the use of modern mining methods and sold at a reasonable profit under then current market conditions."

Q. And was there further language negotiated between the parties?

A. Yes. We again negotiated that language and the following draft stated, "That on, in and under the lands described in the leases listed on the attached Schedule A, there are not less than 4,000,000 tons of marketable and merchantable bituminous coal," and again that was the typed version where the definition stated, "shall mean bituminous coal that can be reached in the normal mining

operations and can be mined and removed with the use of modern mining methods and sold at a reasonable profit under then current market conditions."

Q. Did you object to those definitions?

A. We negotiated them, yes.

Q. And what was the problem with that language as far as your client was concerned?

A. It was subjective and dependent upon the success of the Twin Oaks mining operation.

Q. And was this whole business deal to rest upon the success or failure of the Twin Oaks mining operation?

A. It was not.

Q. Then what happened?

A. From that definition we evolved to the definition of recoverable bituminous coal as defined in the agreement with reference to maximum stripping ratios in the area.

Q. And that final agreement the language of merchantable and selling them at market price and the economic factors that were negotiated out during the negotiations; is that right?

A. Yes.

Q. And therein lies the basis for your opinion with regard to the final definition, being the generally accepted maximum stripping ratio in the area at the time of the agreement.

A. Yes.

Q. As to govern the extent of the warranty of coal.

A. Yes.

MR. FAWCETT: All right.

MR. SMITH: Mr. Pietragallo.

MR. PIETRAGALLO: No, thank you.

RECROSS EXAMINATION

Appellant contends that the above testimony created an ambiguity where none had previously existed. Twin Oaks also asserts that this testimony removed the economic element, which others had testified was an important component of the contract. Appellant's analysis of the testimony

is overbroad and not precisely correct. Mr. McGinley's testimony regarding the negotiation of the terms only showed that Daset did not want the warranty of the amount of recoverable bituminous coal to rise or fall on the expertise or lack of same, on the part of Twin Oaks. In other words, the economic factor in the contract was not to be pegged to Twin Oaks' ability or inability to successfully mine the coal in an economically feasible manner. Rather, the standard, which was finalized in the contract, was that which would be "generally" accepted in the area. Accordingly, if Twin Oaks operation was not efficient and could not successfully mine these leases, there could be no assertion on its part that there was not the amount of coal warranted. Therefore, we do not agree with Twin Oaks that the economic element was removed from the contract. What was removed was the subjective standard of the appellant. The final negotiated contract was based on an economic standard, which would be acceptable to others engaged in a similar business in the area. Therefore, we hold that the trial judge did not err by permitting testimony of prior negotiations and agreements.

Appellee's only contention on appeal is that the trial court erred in not awarding more than the legal interest rate, in prejudgment interest, on the monies due Daset on the note. Appellee asserts that to restrict the interest rate to six percent (6%), when market interest rates are greatly in excess of that amount, only encourages non-payment of obligations and protracted litigation. Furthermore, Daset argues that Twin Oaks has engaged in tactics, which unjustly enriches itself to the financial detriment of appellee. Appellee concedes that the trial judge's decision is historically correct, but posits that the dramatic change in the economic situation and the correlating high market interest rates render this decision manifestly unjust.

The legal rate of interest in Pennsylvania is fixed at six percent (6%) by statute 41 P.S. § 202 [8] as follows:

§ 202 Legal rate of interest

8. Act of Jan. 30, 1974, P.L. 13, No. 6, § 202 imd. effective.

Reference in any law or document enacted or executed heretofore or hereafter to "legal rate of interest" and reference in any document to an obligation to pay a sum of money "with interest" without specification of the applicable rate shall be contrued to refer to the rate of interest of six percent per annum.

Traditionally, Pennsylvania has followed the Restatement (Second) of Contracts § 354 [9] which states as follows:

§ 354. Interest as Damages

(1) If the breach consists *of a failure to pay a definite sum in money or to render a performance* with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.

Comment:

a. Scope. This Section deals with an injured party's right to interest as damages in compensation for the deprivation of a promised performance. Had the performance been rendered when it was due, the injured party would have been able to make use of it. Interest is a standardized form of compensation to the injured party for the loss of that use, *in the absence of agreement to the contrary. It is payable without compounding at the rate, commonly called the "legal rate," fixed by statute for this purpose.* (Emphasis supplied).

 In contract cases, prejudgment interest is awardable as of right. *Eazor Express, Inc. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America,* 520 F.2d 951 (3rd Cir.1975), cert. denied; *Gold & Co. Inc. v. Northeast Theatre Corp.,* 281 Pa.Super. 69, 421 A.2d 1151 (1980). In claims that arise out of a contractual right, interest has been allowed at the legal rate from the date that payment was wrongfully withheld, where the damages are liquidated and certain, and the interest is readily ascertainable through computation. *Paul Revere Protective Life Ins. Co. v. Weis,* 535 F.Supp. 379

---

**9.** This section was formerly § 337.

(E.D.Pa.1981); *Girard Bank v. John Hancock Mutual,* 524 F.Supp. 884 (E.D.Pa.1981); *Formigli Corp. v. Fox,* 348 F.Supp. 629 (E.D.Pa.1972); *Miller v. City of Reading,* 369 Pa. 471, 87 A.2d 223 (1952). Moreover, in contracts concerning payment of a sum of money, which bear an interest rate higher or lower than the legal rate; if the parties do not contract that it shall be the rate after the debt becomes due; then, the interest rate fixed by law attaches for the detention of the principal sum. *Ludwick v. Huntzinger,* 5 Watts & S. 51 (1841); *Weinberger v. Wickert,* 5 Berks 36 (1912); 41 P.S. § 202; 11 *Williston, Contracts* § 1416 (3rd Ed.1968). However, contract provisions for non-payment of money due, which provide for a specific rate of interest have been upheld. *See, O'Brien & Gere Engineers, Inc. v. Taleghani,* 525 F.Supp. 750 (E.D.Pa.1981) (amount not paid by stipulated date, simple interest of 12% per annum).

A review of the case law reveals that the trend of the courts has been to take an equitable approach in determining interest as an element of damages. *See, E.I. Du Pont de Nemours & Co. v. Lyles & Lang Construction Co.,* 219 F.2d 328 (4th Cir.1955) (interest to be awarded not at legal rate, but at rate plaintiff would have had to pay upon loan of similar amount in view of state money market); *Davis Cattle Co. v. Great Western Sugar Co.,* 544 F.2d 436 (10th Cir.1976) (interest awarded at 11.5% per annum, not statutory rate of 6%); *Peterson v. Crown Financial Corp.,* 553 F.Supp. 114 (E.D.Pa.1982) (interest awarded at rate of 2½% above prime rate); *Nedd v. United Mine Workers of America,* 488 F.Supp. 1208 (M.D.Pa.1980) (no interest awarded where union did not benefit from breach of trust). *But see, Traffic Safety Co. Inc. v. Horan,* 21 B.R. 669 (Bkrtcy.Pa. 1982) (former trustee of estate only liable for interest at legal rate, not rate which estate would have earned if money invested).

█ The Pennsylvania courts have also adopted this approach, and in equity cases, the award and rate of interest allowed is at the discretion of the chancellor. *Sack v. Feinman,* 489 Pa. 152, 413 A.2d 1059 (1980); decided after

remand 495 Pa. 100, 432 A.2d 971 (1981). Our Supreme Court in *Murray Hill Estates, Inc. v. Bastin*, 442 Pa. 405, 410, 276 A.2d 542, 545 (1971), stated as follows:

> An examination of the cases dealing with the charge and allowance of interest will disclose many difficulties, but the decided trend of courts of law and courts of equity has been 'to break away from hard and fast rules and charge and allow interest in accordance with principles of equity, in order to accomplish justice in each particular case'.
>
> \* \* \* Unless a case be found, which is a conclusive precedent, the safest and at the same time the fairest way for a court is to decide questions pertaining to interest according to a plain and simple consideration of justice and fair dealing.

quoting *McDermott v. McDermott*, 130 Pa.Super. 127, 130, 196 A. 889, 890 (1938).

*See also, In re Kenin's Estate*, 343 Pa. 549, 23 A.2d 837 (1942) (court reduced interest rate from 6% to 2½%); *Barale v. Barale*, 282 Pa.Super. 213, 422 A.2d 1082 (1980) (no interest on partition sale of property).

In the tort area,[10] the Supreme Court has promulgated Pa.R.Civ.Pro., Rule 238, which provides as follows:

> Rule 238. Award of Damages for Delay in an Action for Bodily Injury, Death or Property Damage
>
> (a) Except as provided in subdivision (e), in an action seeking monetary relief for bodily injury, death or property damage, or any combination thereof, the court or the arbitrators appointed under the Arbitration Act of June 16, 1836, P.L. 715, as amended, 5 P.S. § 30 *et seq.*, or the Health Care Services Malpractice Act of October 15, 1975, P.L. 390, 40 P.S. § 1301.101 *et seq.* shall
>
> (1) add to the amount of compensatory damages in the award of the arbitrators, in the verdict of a jury, or in

---

**10.** We are also mindful that in the area of workmen's compensation the interest on awards has been raised from six percent (6%) to ten percent (10%). 77 P.S. § 717.1; *C.W. Brown Coal Co. v. Workmen's Compensation Appeal Bd.*, 62 Pa.Cmwlth. 539, 437 A.2d 458 (1981).

the court's decision in a nonjury trial, damages for delay at ten (10) percent per annum, not compounded which shall become part of the award, verdict or decision;

While these "delay damages" are not termed prejudgment interest as such, they are most certainly a contract prejudgment counterpart. The purpose behind this rule was explained by the Supreme Court as follows, "[T]his rule serves to compensate the plaintiff for the inability to utilize funds rightfully due him, but the basic aim of the rule is to alleviate delay in the disposition of cases, thereby lessening congestion in the courts." *Laudenberger v. Port Authority of Allegheny County*, 496 Pa. 52, 59, 436 A.2d 147, 151 (1981), appeal dismissed, 456 U.S. 940, 102 S.Ct. 2002, 72 L.Ed.2d 462 (1982). *See also, American Enka Co. v. Wicaco Machine Corp.*, 686 F.2d 1050 (1982) (applying Pennsylvania law, damages awarded under Rule 238).

Appellee urges that in light of the above, it is obsolete for the award of prejudgment interest to be limited to the legal rate of six percent (6%).[11] It also contends that with the present high interest rates, it is to a debtor's advantage to withhold payment and litigate. In the event of loss, the money unjustly withheld, if properly invested will generate sufficient income to pay for all costs and interest. This unjust enrichment of the debtor, is in derogation of the principles of equity and is in contravention of the concept underlying the award of interest.

Appellee submits that 41 P.S. § 202 does not prevent the recovery of interest at a rate greater than six percent (6%) where the principles of restitution are utilized. In *Peterson v. Crown Financial Corp.*, 661 F.2d 287 (3rd Cir.1981), the Court of Appeals held that the appellant's claim sounded in restitution. However, in *Peterson*, the court determined that a situation where money was extracted and unjustly withheld was not analogous to a case where a promise to

---

11. In appellee's original complaint, it asked for interest at the rate of ten percent (10%) from the time of breach. However, on appeal, Daset did not limit its argument to any specific amount.

pay money or render a service had been breached. The court reasoned that the appellant's claim was removed from the purview of the Restatement of Contracts and sounded in restitution. In so doing, Judge Adams stated,

> ... [I]t is difficult to draw a logical distinction between the present case—a wrongful demand and acceptance of a sum paid under protest—and the refusal to pay funds due under a contract. It may be inequitable to require debtors to pay only six percent under present Pennsylvania law yet force creditors who have made wrongful demands to disgorge at money-market rates. As to the former situation, however, Pennsylvania has provided clear—if questionable—precedent to which a federal court sitting in diversity is bound.

*Id.* at 298.

■■■■■■■ Unfortunately, while we find appellee's arguments logical and persuasive, the law in Pennsylvania, at this time, does not permit an award of prejudgment interest in an amount greater than six percent. Appellee's claim is under the purview of the Restatement and as such does not sound in restitution. Further, we do not agree with appellee that this is a matter for judicial reform. Being statutory, reform in this matter is the province of the legislature.

■■■■ Additionally, we are mindful that this contract was extensively negotiated by skillful and knowledgeable individuals, who should have been well aware of the applicable law and the possible consequences in the event of breach of the agreement. The contract specifically provided that the note for one million dollars, which was payable on or before one year from the date of the execution of the agreement, was to generate six percent (6%) interest per annum on the balance remaining unpaid until the due date. However, since the parties neglected to make any provision on the rate of interest on the note in the event of breach, the trial court could only award prejudgment interest at the legal

rate prescribed by statute. Accordingly, appellee's counterclaim is dismissed.

Judgment affirmed.