518 A.2d 1323

Green International, Inc. and McCormick, Taylor & Associates, Inc., a joint venture, Petitioners *v.* Department of General Services, Respondent.

Commonwealth of Pennsylvania, Department of General Services, Petitioner *v.* Green International, Inc. and McCormick, Taylor & Associates, Inc., a joint venture, Respondents.

Argued November 18, 1986, before Judges CRAIG and BARRY, and Senior Judge KALISH, sitting as a panel of three.

*Michael D. Reed,* Chief of Litigation, with him, *Thomas M. Devlin,* Assistant Counsel, and *Anthony P. Krzywicki,* Chief Counsel, for petitioner/respondent, Commonwealth of Pennsylvania, Department of General Services.

*Brian W. Ashbaugh,* with him, *Richard DiŞalle, Rose, Schmidt, Chapman, Duff & Hasley,* for petitioners/respondents, Green International, Inc. and McCormick, Taylor & Associates, Inc., a joint venture.

OPINION BY JUDGE CRAIG, January 8, 1987:

Green International, Inc. (Green) and McCormick, Taylor & Associates, Inc. (MTA), two corporations acting as a joint venture, and the Department of General Services (DGS) cross-appeal from an order of the Board of Claims (board) directing DGS to pay the joint venture $157,446.68 in damages for a breach of a construction contract executed by the parties on September 23, 1971.

## I. *Facts*

According to the board's findings of fact, DGS and the joint venture executed an agreement under which the joint venture was "to provide all necessary design services and review and inspection of construction" for project No. GSA 800-145: facility improvements at the Pennsylvania State University. Originally, the scope of the project included additions to the university's potable water system, sanitary sewage system, electrical system and the central heating plant, as well as the construction of a central security and environmental monitoring system for campus buildings. DGS administered the project in two distinct phases: Phase I construction, which proceeded as planned, and Phase II construction, which is the subject of this appeal.

A major dispute between the parties centers upon the amount to which the joint venture is entitled for delays in the construction of Phase II. DGS awarded two Phase II construction contracts, both of which established a scheduled completion date of August 27, 1976. Phase II construction did not, however, conclude until December, 1980. The board found several reasons for the delay: (1) MTA's unanticipated difficulty in drilling a test well; (2) Green's submission of an incomplete design at the pre-final stage of Phase II; (3) Green's work on a non-DGS project to which Green had given priority; and, (4) several design revisions.

Before Phase II completion, the joint venture submitted a claim to DGS for additional compensation because of the delay. In response, DGS paid the joint venture $43,649.01 by way of an amendment to the contract executed on February 22, 1980. The joint venture, however, now claims that it is entitled to additional compensation based on further delays beyond those contemplated in the 1980 amendment and on improper

delay damage calculations by DGS when it made the $43,649.01 award.

The board's calculation of damages is as follows:

| | |
|---|---|
| Basic Service Fee | $311,077.73 |
| Additional Compensation for Delay | 90,120.25 |
| Additional Work | 83,164.15 |
| New Water Well | 95,770.00 |
| Change Order Fees | 4,069.93 |
| TOTAL: | $584,202.06 |
| Subtract payments received by Claimant | 426,755.38 |
| TOTAL due Claimant | $157,446.68 |

Both parties contend that the board committed computational errors and errors of law when it arrived at the $157,446.68 total due to the joint venture. We will address each claim in the order in which it is raised.

## II.  *DGS Appeal*

### A.  *New Well Payments*

On April 2, 1975, DGS and the joint venture executed an amendment to the agreement providing:

(c)  The Professional shall receive an additional sum not to exceed the amount of Ninety-Five Thousand, Seven Hundred Seventy and 00/100 Dollars ($95,770.00) to cover the cost of a New Water Well. . . .

The agreement designates Green and MTA as "the Professional".

The parties do not dispute the joint venture's performance under the terms of the amendment through a subcontractor to the MTA Corp. Neither do the parties dispute DGS' tender of $105,347 in six checks payable to MTA ($95,770 plus 10% contractor's fee). DGS, how-

ever, argues that the board erred when it failed to credit DGS with the $105,347 payment to MTA.[1] The joint venture contends that the board properly excluded the credit because DGS tendered payment to MTA alone, and not to the joint venture as designated in the amendment.

The record contains the following: five letters mailed from MTA to DGS between September 6, 1974 and April 27, 1975 enclosing invoices from the subcontractor, Layne-New York Company, Inc., for work done on GSA 800-145—Penn State University-New Well; six invoices from Layne-New York Company totalling $95,768.38; and copies of six checks drawn by DGS under project No. 800-145 "Par C"—the amounts of which correspond to the Layne invoices plus a ten percent fee for MTA.

The joint venture contends, without citing authority, that for DGS to claim credit for the new well payments, it must prove: (1) that the joint venture with whom it contracted is a partnership rather than an association; (2) that MTA was acting as a member of such partnership when it received the payments totalling $105,347; and (3) that DGS's proof of the payments is credible.

DGS argues that it made the checks payable to MTA alone to expedite payment to Layne-New York Co., the subcontractor under MTA's supervision, and that the classification of the joint venture as a partnership or an association is irrelevant to the validity of the credit

---

[1] The record contains Exhibit P-131, which is a collection of 37 payment invoices dated from September 28, 1971 to April 22, 1977, documenting payments from DGS to the joint venture for GSA 800-145. The board cites P-131 in its determination of credit due to DGS. The exhibit does not, however, include invoices of six payments to MTA under the designation GSA 800-145—"Par C" for the new well.

claim. DGS argues that the relevant determination is the board's Conclusion of Law No. 16 which states:

> Payment to one party of a joint venture constitutes payment to the joint venture.

We need not resolve the question of whether or not the board's Conclusion of Law No. 16 is a correct statement of Pennsylvania law, however, because it is not determinative of DGS's entitlement to the $105,347 credit. Even if payment to MTA does not constitute payment to the joint venture in this case, DGS' oversight amounts to an immaterial departure from the contract's requirements.

A review of the facts concerning the operation of the joint venture reveals that the Green-MTA joint venture is a joint venture in name only. The record does not contain evidence of a joint venture agreement between Green and MTA, nor does the record indicate that the two companies exerted mutual control over any segment of the project. To the contrary, the record reveals that Green requested that DGS treat Green and MTA separately for GSA 800-145 purposes because the work of the two companies did not interrelate. DGS refused to alter the agreement treating MTA and Green as a joint venture.[2]

Furthermore, Green and MTA state that they do not share in the profits or losses realized in the DGS contract. Apparently, the only area of joint control between the companies is a joint checking account into which DGS payments are deposited and from which individual disbursements are made to Green or MTA.

---

[2] The record contains Exhibit P-3 which is a letter, dated August 24, 1971, from M.A. Mador, Esq., former Chief Counsel of DGS, responding to Green's request to divide the GSA 800-145 contracts between Green and MTA according to their fields of responsibility.

Although a literal reading of the contract amendment mandates payment to the joint venture for the new well, DGS' payments to MTA, instead of to Green-MTA, appears to be a harmless error in light of MTA's exclusive interest in the new well payments. We, therefore, conclude that the board erred as a matter of law when it failed to add $105,347 to the $426,755.38 total representing payments received by the joint venture. The correct calculation of the total of DGS's payments is $532,102.38.[3]

## B. *Delay Damages*

DGS argues that the board's Finding of Fact No. 71(c), which states that DGS is liable for delay damages based on a delay in construction from January 10, 1977 to July 27, 1981 (55 months), is in error because it conflicts with the board's Conclusion of Law No. 12, which states that the joint venture is responsible for six months of the delay, and Conclusion of Law No. 13, which states that Phase II construction concluded in December, 1980.

The relevant contract provision states:

*4.2.100 Effect of Delays in Construction.* If the actual period of construction shall not exceed the period of construction specified in the Contract Documents by more than twenty percent (20%) the Professional shall perform all construction in-

---

[3] The joint venture contends that DGS is barred from claiming the $105,347 payment because it did not specifically plead that payment as an affirmative defense under Pennsylvania Rule of Civil Procedure 1032. We note, however, averment No. 47 of DGS' answer to the joint venture's amended statement of claim under the heading "New Matter": DGS avers a total payment of $581,415.58 to the joint venture which would include the new well payments. Therefore, the board did not err by accepting evidence on the issue of well payments.

spection and review services during the period of such delay in accordance with Section 2.2.503 without additional compensation except that, on request, the Authority may during such period release up to fifty percent (50%) of the remainder withheld under Section 4.1.104(a). If the period of this delay shall exceed such twenty percent (20%) through no fault of the Professional, then the Professional shall, for each month of such additional delay [beyond such twenty percent (20%)] during which there is additional and active construction at the site receive additional compensation in the amount of 125% of the monthly installments computed under Section 4.1.104(b).

The board's Finding of Fact No. 81(b) states:

**B.   *Delay Compensation.***

Fee Phase II times .15 divided by 22 x 1.25 = $1,638.55 per month.

55 months delay x $1,638.55 per month = $90,120.25

The board's Conclusions of Law Nos. 12 and 13 state:

No. 12.   Six months worth of delay in the Honeywell Contract were due to the failure of Claimant to fulfill its duty to properly 'inspect and review the performance' of Honeywell's work, pursuant to Section 2.2.501 and 2.2.503 of the [general contract]

No. 13.   There was no 'actual and active construction at the site', as used in Section 4.2.100, subsequent to December 4, 1980, *i.e.*, the final inspection date for the Honeywell contract.

DGS argues that the board made a clerical error when it failed to reduce the fifty-five month figure used in Finding of Fact No. 81(b) by six months, consistent with its Conclusion of Law No. 12. DGS also argues that, according to the board's Conclusion of Law No. 13,

the calculation in Finding of Fact No. 81(b) should be based on 41.5 months because the board concluded that construction ceased on December 4, 1980, not the July 27, 1981 date used to calculate the 55 month delay total.

The joint venture contends that the board's Conclusion of Law No. 12 is not supported by substantial evidence in the record. Furthermore, the joint venture contends that the calculation of the delay time is governed not by the cessation of actual construction, but by paragraph 2.2.500 of the agreement. Paragraph 2.2.500 states that the scope of the construction phase of the project will terminate when DGS formally accepts performance and makes final payment.[4] Because DGS made its final payment on July 27, 1981, the joint venture contends that it is entitled to delay damages up to that date.

## 1. *Six Month Delay*

We note that the board's Conclusion of Law No. 12 is, more accurately speaking, a finding of fact.[5] *See Black's Law Dictionary*, 569 (5th Ed. 1979). Our scope of review is limited to determining whether findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C. S. §704, *Estate of Francis J. McGovern v. State Employees' Retirement Board*, 512 Pa. 377, 517 A.2d 523 (1986).

---

[4] 2.2.500 *Scope of Phase.* The Construction Phase will commence with the Award of Construction Contracts, and will terminate when the Project is accepted from the Authority by the Using Agency and the last final payment is made by the Authority to the last of the Construction Contractors to receive such payment.

[5] A finding of fact is a determination from the evidence of a case, either by a court or an administrative agency, concerning facts averred by one party and denied by another. *Black's Law Dictionary*, 569 (5th Ed. 1979).

Our review of the record confirms the argument of the joint venture that Conclusion of Law No. 12 is unsupported by any evidence in the record. DGS contends that the testimony of Anthony Petulla, an electrical inspector for DGS, supports the conclusion that the joint venture's failures in inspecting the project caused six months of the total delay in Phase II construction. Our review of Mr. Petulla's testimony indicates that a contractor's improper electrical installation caused at least a six month delay in the project. However, Mr. Petulla's testimony does not support the contention that the joint venture's failure to inspect the project would have prevented the six month delay. Therefore, we conclude that, even if the board failed to credit DGS with the six month delay allegedly attributed to the joint venture, the error is harmless because Conclusion of Law No. 12 has no factual basis in the record.

## 2. *Completion Date*

We note that the board's Conclusion of Law No. 13 is similarly a finding of fact, and we therefore apply the appropriate standard of review established in *Estate of McGovern.*

The testimony of Mr. Petulla provides substantial evidentiary support for the finding that construction on the project had stopped on December 4, 1980.[6] The

---

[6] The relevant testimony is as follows:

Q. Now, P-98 appears to be a memo from Mr. Kippel to Mr. Ryan dated December 8, 1980. Do you see that, sir?

A. Yes, I do.

Q. It identifies that a final inspection was held on December 4, 1980.

A. Yes.

. . . .

Q. From the date of final inspection until this bond inspection approximately a year later, was there any activity going on at the site, any construction going on at the site?

A. Do you mean on the part of the contractor?

Q. Yes.

A. No.

joint venture contends however, that paragraph 2.2.500 of the agreement, equating the conclusion of construction with acceptance and final payment, determines when construction concludes for delay damage purposes. We note that paragraph 4.2.100, governing the effect of delays of construction, permits delay compensation "for each month of such additional delay . . . during which there is *actual and active construction at the site* . . ." (emphasis added). The plain meaning of the contract language is that the delay damage clock stops when actual construction activity stops, not when DGS provides final approval or payment under paragraph 2.2.500.

Hence, the board's conclusion in Finding of Fact No. 81(b), that DGS is responsible for a delay of fifty-five months must be modified to conform with the board's finding that no actual construction occurred after December 4, 1980. Indeed our conclusion that DGS is liable for a delay of forty months in part IIIA of this opinion is based on the December, 1980 completion.

## C.   *Credit for As-Built Drawings*

Paragraph 2.2.509 of the agreement provides:

> *'As-built drawings.'* Upon completion of construction the Professional shall deliver to the Authority one set of clear white prints reflecting all changes made during the course of construction, such information having been obtained from the contractors, and showing the Project 'as built'.
>
> . . .

Paragraph 4.1.104 of the agreement provides a schedule of payments to the joint venture during the actual construction of the project.[7] According to subpar-

---

[7] 4.1.104 *Schedule of Payments During Construction Phase.* The remaining 25% of the Professional's Fee shall be paid in install-

agraph (a), DGS is entitled to retain 5% of the joint venture's fee for Phase II until DGS accepts a set of as-built drawings. DGS contends that the board ignored competent evidence proving that the joint venture never supplied DGS with the set of drawings, so that DGS is entitled to a credit of $9,612.85 representing the 5% retained amount under paragraph 4.1.104.

Our scope of review is not, however, to determine if the board capriciously disregarded competent evidence. Under our state Supreme Court's recent pronouncement in *Estate of McGovern*, our scope of review is limited to a determination of whether the board's findings of fact are supported by substantial evidence.

Although the board made no express finding that DGS accepted the as-built drawings, the fact that the board did not credit DGS with the 5% retained amount represents an implied finding that the joint venture provided the drawings as required by paragraph 2.2.509.

---

ments during the Construction Phase beginning with the first Job Conference as follows:

(a) Withheld by The Authority until acceptance by the Authority and Professional's Certificate of Final Completion and As-Built Drawings

| Retainage | Payment | Aggregate |
|-----------|---------|-----------|
| 5% | 80% | |

(b) Upon one-third of the Contract completion time for approval of materials and shop drawing

| Retainage | Payment | Aggregate |
|-----------|---------|-----------|
| | 5% | 85% |

(c) Balance of payment apportioned into as many installments as there are calendar months from the actual start of construction to the completion date specified in the Contract Documents

| Retainage | Payment | Aggregate |
|-----------|---------|-----------|
| | 15% | 100% |

Our review of the record reveals evidence that the joint venture produced copies of the as-built drawings. Most significant is the joint venture's amended statement of claim submitted to the board in which it claims, in averment No. 27, to have "fully performed all the work and conditions precedent on its part to be performed under the terms of the agreement." DGS admitted averment No. 27 as true in its response. Additionally, the testimony of DGS inspector Anthony Petulla supports the joint venture's contention that it provided as-built drawings to DGS:

> Q. Why had you made the request [for as-built drawings] of [Gene Mazza, employe of Green International]?
>
> A. At the time of taking the job over, I only had one set of field drawings, and they were marked up pretty heavily, so at the final inspection or prior to it, the contractor is to furnish the Professional a set of as-built drawings; so since I didn't have any drawings that were clean and I could mark up due to the length of this project, I asked Gene if he would not only send me a set of clean drawings but mark them up in accordance with the contractor's drawings so I could submit it to Harrisburg, and that is what he did.

Because we find that the board's implied finding that the joint venture provided as-built drawings to DGS is supported by substantial evidence in the record, we reject DGS's claim to the 5% retainage credit under paragraph 4.1.104 of the agreement.

### III.  *Joint Venture Appeal*

#### A.  *Delay Calculation*

Paragraph 4.2.100, recited in part IIB of this opinion, governs compensation for delays in construction.

The board determined, in its Finding of Fact No. 71(a), that the scheduled period of construction for delay compensation purposes is 679 days: the period running from October 18, 1974, the date construction of Phase II of GSA 800-145 began, to August 27, 1976, the completion date specified in a DGS-Honeywell contract for Phase II construction.

The joint venture argues that the board thus erred by considering a contract to which the joint venture was not a party when it determined the construction period for paragraph 4.2.100 purposes. DGS contends that the Honeywell contract falls within the definition of "Contract Documents", as used in paragraph 4.2.100, and therefore the period of construction specified in the Honeywell contract may be used to calculate delay damages.

In the board's opinion, the similarity of the definition of "Contract Documents" in the DGS-Green/MTA contract and the DGS-Honeywell contract dictates that the construction period specified in one is necessarily binding on the other:

> The logical starting point in interpreting 'the period of construction specified in the Contract Documents' is with section 12.2.100(e) of the [general contract] which provides a definition of 'Contract Documents'. That definition is the verbatim definition of 'Contract Documents' from DGS's Standard Provision for Contract Documents, 1970 edition, which is incorporated by reference in the Agreement. The DGS Standard Provisions for Contract Documents were used in all construction contracts awarded by DGS, including the Honeywell contract.

> Thus, the 'period of construction specified in the Contract Document' is the period specified in the construction contracts awarded by DGS.

We must disagree with the board that the construction period specified in the Honeywell contract binds the joint venture. The definition of "Contract Documents" in paragraph 12.2.100(e) provides:

> (e) *Contract Documents* consist of the Agreement, Notice to Bidders, the Instructions to Bidders, the Bid Proposal, the Contract Bond, the Conditions of the Contract (General, Special, Supplementary and other Conditions), the Drawings, the Specifications and all Bulletins and Adenda [sic] issued prior to execution of the Agreement, and all Modifications thereto and all Rules, Regulations and Instructions of the Authority issued by the Authority pursuant to Paragraph 3.2.3. A modification is (1) a written amendment to the Contract signed by both parties, (2) a Change Order, (3) a written order for a moderate change in the work issued by the Authority pursuant to Paragraph 12.3. A modification may be made only after execution of the Contract.

We cannot read this definition to include any Phase II construction contract not executed by the parties nor incorporated into their basic construction agreement. DGS contends, however, that an examination of the practice of the parties during the performance of the agreement evidences the joint venture's reliance upon the Honeywell contract's scheduled construction period.

When interpreting a contract we must determine the intent of the parties. *Robert F. Felte, Inc. v. White,* 451 Pa. 137, 302 A.2d 347 (1973). Our first step in achieving this goal, however, is to examine the plain meaning of the language in the agreement. *Giant Markets, Inc. v. Sigma Marketing Systems,* 313 Pa. Superior Ct. 115, 459 A.2d 765 (1983). The plain meaning of paragraph 12.2.100(e) dictates that we look only

to the agreement between DGS and the joint venture and its amendments.

The joint venture contends that paragraph 2 of the original agreement establishes the scheduled period of construction for paragraph 4.2.100 purposes. Paragraph 2, entitled "Tentative Time Schedule", states that the completion of construction for Phase II is to occur on November 30, 1973. The paragraph does not, however, list a commencement date or otherwise indicate the length of the period of construction. Additionally, because of the excessive delays preceding Phase II construction, actual construction did not begin until October 18, 1974. Although paragraph 4 may have been an indicator of the tentative construction schedule originally contemplated by the parties in 1970, the reality of the actual construction of Phase II no doubt altered the parties' intent.

We find that an amendment to the DGS-joint venture agreement, executed on February 22, 1980, provides a more contemporary indicator of what the parties contemplated as a Phase II construction schedule for paragraph 4.2.100 purposes:

(e) Professional shall receive a sum not exceeding the amount of Forty-Three Thousand, Six Hundred Forty-Nine and 01/100 Dollars ($43,649.01) for 27 months additional supervision on above project for period ending October 31, 1979; all in accordance with Paragraph 4.2.100.

Working backward from the October 31, 1979 date stated in the amendment, the paragraph establishes DGS's liability for twenty-seven months' worth of delay damages beginning on July 31, 1977. The July 31, 1977 date therefore also represents the extended completion date after allowance of the 20% leeway period specified

in paragraph 4.2.100.[8] That is, because construction of Phase II had not begun until October 18, 1974, the above-quoted amendment treats the 33.5 month period from that construction commencement until July 31, 1977 as necessarily being 120% of the scheduled construction period the parties contemplated when they executed the 1980 amendment. Simple arithmetic dictates that the scheduled construction time contemplated by the parties was almost twenty-eight months running from mid-October, 1974 to mid-February, 1977.

DGS is liable, therefore, for paragraph 4.2.100 delay costs running from July 31, 1977 to December 4, 1980, the date of Phase II actual construction completion, or forty months, including the twenty-seven months for which DGS is entitled to credit for compensation already paid to the joint venture under the terms of the 1980 amendment to the agreement.

## B.  *Agreed Estimated Construction Costs*

According to paragraph 4.1.100,[9] entitled "Basis of Professional's Fee," DGS is to calculate the basic service fee due the joint venture as a percentage of the agreed estimated construction cost (AECC).

-----

[8] Paragraph 4.2.100 provides, in part, that "[i]f the period of such delay [in excess of the period of construction specified in the contract documents] shall exceed such twenty percent [of the same period of construction] through no fault of the Professional, then the Professional shall, for each month of such additional delay [beyond such twenty percent (20%)] during which there is actual and active construction at the site receive additional compensation in the amount of 125% of the monthly installments computed under 4.1.104(b).

[9] 4.1.100 *Basis of Professional's Fee.* Until submission of the detailed estimate of the cost of construction and the fixing of the Agreed Estimated Construction Cost under Section 2.2.302 the Professional's fees and payments shall be based upon the amount fixed in the Allocation for construction cost. When the Statement of

The board determined the AECC to be $4,161,575 ($1,589,575 for Phase I construction; $2,572,000 for Phase II construction). The joint venture contends that the board ignored substantial evidence that the AECC was actually $4,584,000. Specifically, the joint venture holds out DGS's initial response to an interrogatory in which it asserts the AECC to be $4,584,000. At the hearing, DGS argued that its response to the interrogatory was erroneous and that it should be permitted to supplement its response with what it believed to be the correct figure. The board did not allow DGS to supplement its response to the interrogatory but permitted it to present evidence as to what it believed the proper AECC to be.

Because we are restricted under section 704 of the Administrative Agency Law, 2 Pa. C. S. §704, to a determination of whether the board's findings are supported by substantial evidence in the record, and not whether the board ignored competent evidence which might disprove a finding, we need only search the record for substantial evidence supporting the $4,161,575 AECC.

Relevant to our search is the testimony of William C. Skelly, the Assistant Director of Engineering and Architecture at DGS at the time of Phase II construction:

Q. All right. Give me Phase I.
A. Phase I is still the same amount you had on the other sheet, $1,589,575.
Q. Okay.

---

Agreed Estimated Construction Cost is approved and finalized, all fees and payments shall be based upon such cost, and all prior payments shall be adjusted in accordance therewith between the parties. Except as specifically otherwise agreed, the fee determined hereunder shall be the Professional's entire compensation for the Basic Services.

A. Phase II, and this would be the approved pre-final estimate for Phase II, $2,572,000.

. . . .

Q. Would you add those?

. . . .

Q. That figure is $4,161,575?

A. Correct.

We also note exhibits D-48 and P-55, correspondence between Green and DGS and an internal DGS memorandum, confirming the Phase II AECC at $2,572,000.

We therefore affirm the board's Finding of Fact No. 74 establishing the AECC at $4,161,575 and affirm the board's award of basic service fees of $311,077.73 using the fee percentage of 7.475%[10]

## C. *Interest on Damages*

The board's Conclusion of Law No. 17 provides:
No. 17. In Contract claims for liquidated sums pre-judgment interest is a matter of right, but is limited by Pennsylvania law to 6% simple annual interest from the date payment was withheld.

DGS accepts the board's conclusion as a correct statement of the law.[11] The joint venture, however, views this case as one for equitable restitution and contends that the board may, at its discretion, impose a higher rate of interest on DGS.

The joint venture relies principally on *Peterson v. Crown Financial Corporation,* 661 F.2d 287 (3rd Cir.

---

[10] The 7.475% fee percentage is established by a DGS fee percentage schedule appended to the agreement. The schedule lists a 5.975% fee percentage based on the $4,161,575 AECC plus an additional 1.5% under paragraph 3 of the agreement.

[11] *See* Section 202 of the Act of January 30, 1974, P.L. 13, No. 6, 41 P.S. §202.

1981), *on remand*, 553 F. Supp. 114 (E.D. Pa. 1982), to support its contention. In *Peterson,* the court of appeals held that the district court "has discretion to award damages in the nature of prejudgment interest in an amount greater than six percent" in a case involving restitution to a plaintiff who made interest payments to a defendant under protest. *Id.* at 293.

Our Superior Court recently distinguished *Peterson* from a case involving arguments similar to those raised by the joint venture in *Daset Mining Corp. v. Industrial Fuels Corp.,* 326 Pa. Superior Ct. 14, 473 A.2d 584 (1984):

> Appellee submits that 41 P.S. §202 does not prevent the recovery of interest at a rate greater than six percent (6%) where the principles of restitution are utilized. In Peterson v. Crown Financial Corporation, . . . the Court of Appeals held that the appellant's claim sounded in restitution. However, in Peterson, the court determined that a situation where money was extracted and unjustly withheld was not analogous to a case where a promise to pay money or render a service had been breached. The court reasoned that the appellant's claim was removed from the purview of the Restatement of Contracts and sounded in restitution.

*Id.* at 38-39, 473 A.2d at 596. (Citation omitted.)

DGS argues that the joint venture's claim, like the plaintiff's claim in *Daset,* is one for breach of a promise to pay, thereby placing the case within section 354 of the Restatement (Second) of Contracts[12] and limiting

---

[12] Section 354 Interest as Damages

(1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.

the joint venture's prejudgment interest to the statutory rate. We agree.

The joint venture contends, without citing evidence in the record, that it was forced to finance part of the project and, therefore, is entitled to restitution for what DGS owes the joint venture. The joint venture's claim does not, however, sound in restitution for amounts unjustly held by DGS. The joint venture's claim to additional *compensation* is based on the contractual theory that DGS breached a promise to pay the joint venture for the extra work occasioned by delays which occurred through no fault of the joint venture.

We conclude that the prejudgment interest awarded by the board is not controlled by *Peterson* but rather by statute. The board's Conclusion of Law No. 17 is, therefore, a correct statement of the law, and the imposition of six percent annual interest from July 27, 1981[13] is affirmed, subject to the extent that the board's order is modified by this opinion.

### D.  *Preliminary Objection Filing*

The joint venture contends that this court should remand this case for a rehearing and direct the board to accept the averments in the joint venture's original statement of claim as true because the board erred when it accepted DGS's preliminary objections filed three days after the thirty day time limit established in section 4 of the Board of Claims Act.[14] The joint ven-

---

(2)   In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.

[13] July 27, 1981, is the date DGS made its final payment to the joint venture for GSA 800-145.

[14] Act of October 5, 1978, P.L. 1104, No. 260, 72 P.S. §4651-6.

ture filed preliminary objections to DGS's preliminary objections claiming that DGS' objections were untimely filed and should, therefore, be rejected. The board, however, issued an order denying the joint venture's preliminary objections to DGS' preliminary objections stating:

> It is within the discretion of this board to accept the preliminary objections as filed by the defendant when said preliminary objections are filed within approximately thirty-three (33) days of the date in which the complaint had been filed. The discretionary power of this board has not been abused in accepting the preliminary objections of the defendant.

The joint venture contends that the board does not have discretion to waive DGS's untimeliness because the thirty day limit is established by statute. Our review of the board's enabling statute, however, reveals that proceedings before the board are subject to the Pennsylvania Rules of Civil Procedure to the extent they are not inconsistent with the Board of Claims Act. Section 2(a) of the Act, 72 P.S. §4651-8. The board, therefore, possesses authority under Rule 126 of the Rules of Civil Procedure which states:

> The Court at every stage of any such action or proceeding may disregard any error or defect of procedure which does not affect the substantial rights of the party.

DGS's three day delay in its filing of preliminary objections obviously was not prejudicial to the substantial rights of the joint venture. We, therefore, conclude that Rule 126 of the Pennsylvania Rules of Civil Procedure vests the board with discretion to waive procedural error, and that the board did not abuse that discretion when it received DGS's preliminary objections.

## IV. *Calculation of Damages*

Based on our analysis in the preceding sections, we conclude that the joint venture is entitled to additional compensation of $13,477.03 for the GSA 800-145 project calculated as follows:

| | |
|---|---:|
| Basic Service Fee | $311,077.73 |
| Additional Compensation for Delay | 51,497.60 |
| Additional Work | 83,164.15 |
| New Water Well | 95,770.00 |
| Change Order Fees | 4,069.93 |
| Total | $545,579.41 |
| Less Payments made by DGS | 532,102.38 |
| Total Due Joint Venture | $ 13,477.03 |

*Basic Service Fee:* Paragraph 4.1.100 directs that the basic service fee be calculated by multiplying the AECC, which the board correctly established at $4,161,575.00, by 7.475%, the fee percentage designed in the agreement, yielding $311,077.73.

*Additional Compensation for Delay:* Paragraph 4.2.100 governs the award of additional compensation for delay. During such period of delay,[15] the joint venture is entitled to 125% of the monthly payments calculated under paragraph 4.1.104(c).[16] Paragraph 4.1.104(c) instructs the parties that 15% of the joint venture's fee for Phase II construction is to be withheld and "apportioned into as many installments as there are calendar months from the actual start of construction to the completion date specified in the Contract Documents."

We affirmed the board's finding that the AECC for Phase II is $2,572,000.00 in part IIIB of this opinion.

---

[15] *See* note # 8.

[16] *See* note # 7.

The basic service fee due the joint venture for that phase is $192,257.00 ($2,572,000.00 x 7.475%). According to paragraph 4.1.104(c), therefore, the sum DGS is to withhold and apportion over the course of construction is $28,838.55 ($192,257.00 x 15%).

In part IIIA of this opinion, we derived from the February, 1980 amendment to the agreement the "completion date specified in the contract documents" as being mid-February, 1977. Starting from the undisputed date of commencement of actual Phase II construction, October 18, 1974, there are 28 months to the scheduled completion date. Apportioning $28,838.55 over 28 months yields a monthly payment of $1029.95. The monthly delay compensation according to paragraph 4.2.100, therefore, is $1287.44 ($1029.95 x 125%).

Because we conclude, in part IIIA of this opinion, that the actual delay time for paragraph 4.2.100 purposes is 40 months, the total delay compensation due the joint venture is $51,497.60 ($1287.44 x 40).

*Additional work:* By amendment to the agreement, dated May 5, 1977, DGS agreed to pay the joint venture $83,164.15 in 1977 in settlement of claims the joint venture presented at a pre-claim hearing concerning additional work the joint venture performed. The parties do not dispute this claim.

*New Water Well:* By amendment to the agreement, dated April 2, 1975, DGS agreed to pay the joint venture $95,770.00 to cover the cost of drilling and constructing a new water well. The parties do not dispute this claim.

*Change Order Fees:* The parties agree that the joint venture is entitled to $4,069.93 for performing additional services because of change orders during construction of Phase II.

*Payments Made by DGS:* The board found that DGS had paid $415,811.08 to the joint venture. Additionally,

the parties agree that DGS is entitled to a $10,944.30 credit under paragraph 4.1.105[17] of the agreement. Because we conclude, in part IIA of this opinion, that the board erred in omitting a total of $105,347.00 in payments made by DGS to MTA for the New Water Well, we add that amount to our total of payments credited to DGS. The total of the three credits is $532,102.38.

## ORDER

NOW, January 8, 1987, the order of the Board of Claims, dated September 23, 1985, docket No. 850, entering judgment for Green International, Inc. and McCormick, Taylor & Assoc., Inc., and against the Commonwealth of Pennsylvania, Department of General Services, in the amount of $157,446.68 is vacated and the case remanded to the board with the direction that it enter judgment for Green International, Inc. and McCormick, Taylor & Assoc., Inc. in the amount of $13,477.03 with interest at the rate of six (6%) percent per annum beginning from July 27, 1981.

Jurisdiction relinquished.

---

[17] 4.1.105 *Credit to the Authority.* Professional agrees that 50% of the basic fees payable for his Preplanning Services shall be applied as a credit to the Authority when and if the same Professional is further retained for the total contract completion time for the approval of materials and shop drawings. Professional Design and Construction services of this Project. Providing that, where the Preplanning Tentative Allocation was 20% less than the approved Allocation for the design of this Project, the Preplanning fee shall be adjusted on the basis of the new Allocation and only the balance of the 50% of the basic fees payable for the preplanning services shall be applied as a credit to the Authority. Where the full credit is applied as additional fees, the Authority shall nevertheless not be responsible for any additional payment for preplanning services. The adjustment shall be deducted from the basic fee of the Professional for his Design and Construction Services pro-rated over the payments due upon approval of the Sketch Phase and the Preliminary Document Phase as determined by these General Conditions.