DICK ENTERPRISES,
INC., Petitioner,

v.

COMMONWEALTH of Pennsylvania,
DEPARTMENT OF TRANSPOR-
TATION, Respondent.

Commonwealth of Pennsylvania,
Department of Transportation,
Petitioner,

v.

Dick Enterprises, Inc., Respondent.

Commonwealth Court of Pennsylvania.

Argued June 14, 1999.
Decided Jan. 21, 2000.
Reargument Denied March 28, 2000.
Second Application for Reargument
Denied March 28, 2000.

Kenneth W. Lee, Pittsburgh, for petitioner, Dick Enterprises, Inc.

John J. Buchy, Harrisburg, for respondent, PA Dept. of Transp.

Before DOYLE, President Judge, FRIEDMAN, J., and JIULIANTE, Senior Judge.

DOYLE, President Judge.

The Petitioner, Dick Enterprises (Dick), appeals first from an order of the Board of Claims which awarded it $104,578.80 out of a claim for approximately 3.3 million dollars it alleged it was owed by the Department of Transportation (DOT), and secondly from an order of the Board of Claims which denied its post-trial motions. In addition, the Respondent, Department of Transportation, has cross-appealed from that part of the Board's order which granted Dick Enterprises (Dick) partial relief and likewise appeals the Board's denial of its post-trial motions.

The 46–million dollar contract at the center of the controversy was entered into by Dick and DOT on March 13, 1989, following a formal bidding process, and involved the bridge and highway construction in Allegheny County associated with the reconstruction of the West End Bridge and its adjacent highway, State Route 65.[1] The exact amount of the contract was $45,971,064.45. The particular aspect of the contract which is in dispute is the rate of pay for certain excavation work which the contract required. The contract contained four relevant types of excavation: (1) Class 1 excavation, which involved excavation for the removal of unsuitable material below subgrade having a bottom width of eight feet or more, which was paid at the rate of $7.70 per cubic yard; (2) Foreign Borrow Excavation, which was paid at the rate of $9.00 per cubic yard and involved excavating and backfilling of undercut areas; (3) Select Borrow Excavation, which was paid at the rate of $18.00 per cubic yard and involved supplying backfill and backfilling for extra-depth undercut; and (4) Class 1A excavation, which involved excavation for the removal of unsuitable material below subgrade having a bottom width of eight feet or less and which was paid at the rate of $50.00 per cubic yard.[2] All Class 1A excavation included the cost of backfill and backfilling; Class 1 excavation, on the other hand, did not include backfilling. Therefore, all Class 1 excavation also required either foreign or select borrow backfilling to be performed.

As part of the contract, Dick was required to design and ultimately build Mechanically Stabilized Earth (MSE) walls which traversed much of the project site on the North Side of the Ohio River. These walls were designed to elevate certain portions of the new roadway to correlate with the construction work on the West End Bridge and its ramps. A special provision of the contract concerning MSEs provided as follows:

> Excavation for walls is incidental to the retaining wall items, except that undercut as shown on the roadway cross sections is paid as Class 1A **Special** Excavation.

(Reproduced Record (R.R.) at 749.) (Emphasis added.) The contract, however, contained no pay provision for "Class 1A **Special** Excavation," although, as noted above, it did contain a pay item for Class 1A excavation. In addition, the contract contained roadway cross-sections and overviews of the project area which contained shaded areas, all of which indicated in the

---

1. The contract itself consisted of a bound document containing the parties' signatures, a schedule of prices, special provisions, addenda and supplemental specifications, the contract plans, cross-sections, indicating types of excavation and depth, and the 1987 edition of Publication 408 Specifications.

2. The contract contained estimated quantities of excavation needed: 1,000 cubic yards of Class 1A excavation; 169,003 cubic yards of Class 1 excavation; 102,000 cubic yards of Foreign Borrow Excavation; and 39,518 cubic yards of Select Borrow Excavation.

relevant areas of the Class 1 designated excavation, that either Foreign Borrow or Select Borrow Excavation was required and would be paid for that area. The legend for the cross-sections identified Select Borrow areas by double-cross hatch marks, and Foreign Borrow with single cross-hatch marks. However, two sheets of the roadway cross-sections, Sheets 16 and 17, which identified the type of work required and paid for two abutments, contained a notation "CL 1A," *i.e.*, Class 1A excavation, in areas which contained *neither* single nor double hatch mark shading. These areas, also, contained no limitation indicating where such excavation would begin or end and no portion of the legends for the cross-section drawings indicated any area where Class 1A excavation was required.

Dick began performance of the contract on April 10, 1989, and by August of 1990 it had completed all of the undercut and extra-depth undercut work. As the project proceeded, DOT made periodic progress payments to Dick every two weeks. Specifically, DOT paid Dick for the undercut and extra-depth undercut at the Class 1 rate of $7.70 per cubic yard and the backfill for undercut areas was paid at the foreign borrow rate of $9.00 per cubic yard. Dick did not object to this payment at that time.

During the construction project, Dick and DOT held periodic meetings to discuss the progress of the project and to discuss potential problems with the project. On July 21, 1990, immediately before Dick was about to begin construction of the MSE walls, Dick's project manager, Mr. Blum, requested payment of all excavation under MSE Wall "P" because, he asserted, although the cross-sections of that area indi-

cated that the excavation was to be performed and paid for at the Class 1–foreign borrow rate, the plan sheet showing the calculation for that same area indicated that 12,000 cubic yards were to be done at the Class 1A rate. DOT's representative promised to review the matter, but eventually denied Dick's request.

At an August 28, 1990 meeting, Dick's representative again advised DOT that it wanted the Class 1A excavation rate for all undercut excavation. Specifically, Dick advised DOT that it was utilizing a one-foot measurement from outside of each MSE wall for a depth to the bottom of the undercut or extra depth undercut. DOT's representative asked Dick to submit its request in a formal letter for review, which Dick did on October 18, 1990. On October 25, 1990, DOT responded by again denying Dick's request. On October 30, 1990, Dick requested that DOT convene its construction review committee to address the issue of the proper rate of pay, which DOT did on February 4, 1991. On March 12, 1991, DOT issued a letter informing Dick that the construction review committee had denied its request for payment of the disputed excavation as Class 1A.

On April 11, 1991, Dick filed a claim against the Commonwealth before the Board of Claims. In its complaint, Dick alleged that DOT had breached the contract because it failed to pay Dick the Class 1A Excavation rate and asserted that it was entitled to payment for 46,680 cubic yards at the Class 1A Excavation rate of $50 per cubic yard. Based on this breach, Dick sought payment of $1,286,-015.38.[3] DOT filed an answer denying the allegations and asserting that the disputed work was not Class 1A excavation work.[4]

---

3. Dick arrived at this figure ($1,286,015.38) by taking 46,680 cubic yards and multiplying it by $50 (the Class 1A Excavation Rate) which is $2,334,000. It then subtracted the amount that DOT had paid for this work, albeit at a lower rate, $1,047,984.62.

4. At the close of evidence, Dick amended its complaint to conform to the evidence submitted to seek an award of $3,367,162.08. Specifically, Dick sought payment of 109,192 cubic yards at the Class 1A rate. The Court is unable to determine how Dick arrived at the new amount claimed as the result of the amendment.

Following a 10–day trial, the Board issued a decision and order awarding Dick $104,578.80. In reaching this decision, the Board concluded that a latent ambiguity existed in the classification of and, therefore, for the payment for excavation under the MSE walls. Specifically, the Board noted that the special provision of the contract governing MSE walls provided that such excavation was to paid at the "Class 1A **Special** Excavation" rate. Conversely, several cross-sections which were part of the contract indicated that similar areas required only Class 1 excavation with foreign and select borrow backfilling of those areas. Therefore, the Board found that these provisions conflicted with one another which created an ambiguity as to the type of excavation called for in those areas and the rate of pay for such areas. The Board went on to conclude that the ambiguity only arose when the massive provisions of the contract were examined and, therefore the ambiguity was latent, that Dick had no duty to bring the ambiguity to DOT's attention and that the ambiguity must be construed against DOT, which had drafted the contract. Utilizing the roadway cross-section, the Board concluded that the total amount of undercut indicated by those cross-sections as being directly below an MSE wall or within one foot horizontally of the limits of a wall was 3,237 cubic yards. Accordingly, the Board awarded Dick $104,878.80 (3,237 cu. yards × $50 = $161,850—$46,971.20 (amount already paid to Dick for excavation of area at Class 1 rate)). Both parties filed timely post-trial motions *and* timely appeals to this Court.

Before turning to the merits of each party's appeal, we must first address a threshold issue presented when there is an appeal from an order of the Board denying post-trial motions: Whether a party before the Board of Claims must file post-trial motions pursuant to Pa. R.C.P. No. 227.1 prior to filing a petition for review with

this Court. Stated another way, we must address the issue of whether the Board's initial order in this case constituted a final, and, thus, appealable order,[5] or were post-trial motions required before reaching a final appealable order.

Rule No. 227.1 of the Pennsylvania Rules of Civil Procedure outlines the procedure for filing post-trial motions. However, this rule had been generally inapplicable to proceedings before the Board of Claims because the Rules of Civil Procedure generally were not applicable to the Board of Claims, unless the Board adopted the Rules pursuant to its rulemaking authority. In 1980, in *Stevenson v. Department of Revenue*, 489 Pa. 1, 413 A.2d 667 (1980), the Supreme Court noted this, observing that the Board *may* adopt the Pennsylvania Rules of Civil Procedure as its own, or may adopt its own procedural process. In 1985, in *Consolidated Rail Corp. v. Com., Pennsylvania Liquor Control Board*, 90 Pa.Cmwlth. 595, 496 A.2d 422 (1985), after reviewing the Board's regulations, we observed that, through its regulations, the Board had *not*, in fact, adopted Rule 227.1 as part of its administrative procedures, and we declined to do so on its behalf. We note, however, that, in 1997, the Board amended its regulations to provide as follows:

> This Chapter and the Pennsylvania Rules of Civil Procedure ... govern all matters before the Board. If a discrepancy between this chapter and the [Rules] arises, this chapter applies.

61 Pa.Code § 899.102.

■ Prior to this amendment, however, but following our decision in *Consolidated Rail Corp.*, we revisited the issue in 1987 in *Green International, Inc. v. Department of General Services*, 103 Pa.Cmwlth. 84, 518 A.2d 1323 (1987). After reviewing the enabling statute, which was in effect even at the time *Consolidated Rail Corp.* was decided, we concluded that proceedings before the Board *were* governed by

---

**5.** Our disposition of this issue, however, will not affect the parties' rights in this case as

they also filed timely petitions for review of the Board's initial order with this Court.

the Rules of Civil Procedure. We reached a similar decision in *Department of Transportation v. Anjo Construction Co.,* 666 A.2d 753 (Pa.Cmwlth.1995). Accordingly, we reaffirm our conclusion that proceedings before the Board are governed *generally* by the Rules of Civil Procedure.[6] However, the particular issue here is whether Rule 227.1 specifically applies and requires parties before the Board of Claims to file post-trial motions.

 Rule of Civil Procedure No. 227.1(c) sets out the general rule that:

(c) [p]ost trial motions shall be filed within ten days after

. . . .

(2) notice of nonsuit or the filing of the decision or adjudication in the case of a trial without jury or equity trial.

Pa. R.C.P. No. 227.1(c). Although the rule contains exceptions to the general rule, our review of the exceptions reveals that they do not apply to the present case.[7] It is, of course, solely within the province of the Supreme Court to promulgate and amend the Rules of Civil Procedure. *See* Section 1722 of the Judicial Code, 42 Pa.C.S. § 1722. In the present case, the Supreme Court did exempt certain cases from the requirements of filing post-trial motions, *e.g.,* from final divorce decrees and partition orders. Clearly, if the Supreme Court desired to exempt proceedings before the Board from the requirement of filing post-trial motions, the Court knew how to do so; however, no such exemption exists in the present version of the rule and, therefore, we must conclude that the Supreme Court did not intend to create such an exemption; accordingly, we therefore further conclude that proceedings before the Board are not exempted from the requirement of filing post-trial motions pursuant to Rule 227.1. Accordingly, we will dismiss the appeal of each party from the Board's initial order, and we now turn to the merits of each party's appeal.[8]

 Prior to addressing the merits of each party's appeal, we would note that several well-established principles of contract interpretation exist which this Court will follow. First, a reviewing court's role is not to re-write the provisions of a contract when the language and terms of the contract, taken as a whole, are clear. *City of Philadelphia v. Delaware County Board of Assessment Appeals,* 691 A.2d 992 (Pa. Cmwlth.1997), *petition for allowance of appeal denied,* 550 Pa. 710, 705 A.2d 1311 (1997). Second, a contract will be found ambiguous if, and only if, it is capable of being understood reasonably in more than one sense. The goal of contract interpretation is to ascertain and give effect to the parties' intent, as well as to all portions of the document. *International Organization Master, Mates and Pilots of America, Local No. 2 v. International Organization Masters, Mates and Pilots of America,* 497 Pa. 102, 439 A.2d 621 (1981).

### Dick Enterprise's Appeal— No. 1454 C.D.1998

Dick argues that it should be compensated for the entire amount of undercut indicated on the roadway cross-sections at the Class 1A excavation rate of $50 per

---

**6.** Although we do not overrule *Consolidated Rail Corp.,* we now eschew any language in it suggesting that proceedings before the Board are not governed by the Rules of Civil Procedure, because the Board, itself, adopted those rules by an amendment to its regulations in 1997.

**7.** The closest exception is contained is Rule 227.1(g), which provides that "[a] motion for post-trial relief may not be filed in an appeal from the final adjudication or determination of a local agency or a Commonwealth agency

as to which jurisdiction is vested in the courts of common pleas." Clearly, this exception does not apply because, pursuant to Section 763 of the Judicial Code, 42 Pa.C.S. § 763, this Court, rather than any court of common pleas, has exclusive jurisdiction over appeals from the Board of Claims.

**8.** Of course, if the Board does not wish to accept and dispose of post-trial motions, it is free to amend its regulations to dispose of this requirement.

cubic yard. Crediting the amount that the Commonwealth has already paid Dick for excavation in this area, Dick argues that it was due $3,367,162.08. Although the Board awarded Dick $104,578.80 on the basis that the contract was ambiguous as to the contract rate for certain undercut areas of excavation around the mechanically stabilized earth walls, on appeal Dick argues that the contract unambiguously provides that excavation for *all* undercut areas is to be paid as "Class 1A *Special* Excavation." In support of this argument, Dick points to the special provision, which provides that undercut excavation was to be paid at the Class 1A rate. Based on this provision, Dick argues that **all** undercut, including extra-depth undercut, was to be paid at the Class 1A rate. Alternatively, Dick asserts that the Board erred in limiting its recovery to 3,327 cubic yards because the cross-section area on which the Board relied traversed the entire length of the north side of the project, and, therefore, Dick is entitled to compensation for all those cubic yards as well. We cannot agree with either of these arguments for several reasons.

First, as noted above, Dick argues that the Special provision discussed above should be looked at as superior to all other provisions in the contract. Dick points to the general contract principle that specific language in a contract controls general language in the same document. *See In re Alloy Manufacturing Company Employee Trust*, 411 Pa. 492, 192 A.2d 394 (1963). In addition, Dick points to Section 105.04 of the Publication 408 Specifications, which provides as follows:

> If any special provisions or information on the plans conflict with these specifications, the special provisions or information on the plans will govern. If any conflict exists between any portion of the plans designed specifically for this project and any portion of the Standard Drawings, the former will govern.

(R.R. at 652a.) Accordingly, Dick first asserts that the Special Provision is the only one governing payment of the disputed work and argues that other areas indicating that the disputed excavation is only Class 1, with foreign or select borrow backfill, merely identify for the contractor the *type* of work to be done and where it should be done, not how much he will be paid. We do not agree with that analysis. Initially, the type of work required not only informs a contractor where to do what type of work, but also, due to the specific terms used in the document, *i.e.,* Class 1, Class 1A, Foreign or Select Borrow, informs the contractor what it will be paid for work in that area. Indeed, this is confirmed in Contract Plan Sheet 28, which is an aerial view of the north side of the project entitled "Plan of Undercut and Extra Depth Undercut Excavation Locations and Cross Section Baseline Layout." (R.R. at 1042.) The legend on this sheet contains a description of the excavation, either undercut or extra-depth undercut, as well as pay items, indicating excavation as Class 1 with either select or foreign borrow backfill. Clearly, not only would this diagram inform the contractor what type of work is required, but it would also indicate what rate of pay it would receive for that work.

In addition, we must also disagree with Dick's argument to the effect that the special provision, as a specific provision in the contract, "trumps" the other more general provisions on the same topic. At the outset, we would note that Section 105.04 of the 408 Specifications merely indicates that any special provisions of the contract should prevail over the general specifications in the contract. However, the cross-sections and aerials discussed above are specific and clearly include "information on the plans" and, as such, are no higher, but are also **no lower,** than the special provisions in the contract.

Finally, we would note that the language upon which Dick relies as support for the argument that all undercut and extra-depth undercut is to be paid at the Class 1A rate, i.e., the special provision, provides

that undercut work *related to MSE walls, as indicated on the roadway cross-sections*, is to be paid as Class 1A rate. However, there are many portions of the project which require excavation, either undercut or extra-depth undercut, where no MSE walls were to be positioned. Therefore, Dick's reliance on this section to support its claim for all undercut excavation is misplaced.

■ Accordingly, based upon the above discussion, we conclude that, at the most, Dick established during the proceedings before the Board that a potential conflict exists in the contract concerning the payment of extra-depth undercut, but it certainly did not establish, and we do not interpret the contract to read, that extra-depth undercut was intended to be paid at the Class 1A excavation rate. We will therefore affirm that part of the Board's decision which declined to award Dick payment for all undercut and extra-depth undercut at the Class 1A rate.

### DOT's Appeal—No. 1505 C.D.1998

In its appeal, DOT takes the position that not only is Dick not entitled to the $3,367,162.08 that it seeks on appeal, but also that the Board erred in awarding Dick anything based upon an ambiguity in the contract because: (1) the contract was not susceptible to two reasonable interpretations; (2) Dick did not demonstrate reliance on its own interpretation at the formation of the contract; and (3) any ambiguity in the contract was patent, not latent, and, therefore, Dick had the duty to bring the ambiguity to DOT's attention.

As to DOT's first argument, which really only concerns Dick's assertion that all undercut in the contract, whether undercut or extra-depth undercut, is to be paid at the Class 1A rate, as we have concluded above, is simply not the case. Accordingly, we will not address DOT's first argument further, but we will examine DOT's second issue, that the Board erred by awarding Dick anything based on its finding of an ambiguity.

DOT argues that the Board erred by basing its award to Dick on the doctrine of contra proferentum, *i.e.*, that the provisions of a contract are to be construed against the drafter when language is susceptible to more than one reasonable interpretation. *Com., State Highway and Bridge Authority v. E.J. Albrecht Co.*, 59 Pa.Cmwlth. 246, 430 A.2d 328 (1981). This analysis requires, therefore, a threshold determination of whether the disputed provisions of the contract are suspectible to more than one reasonable interpretation, *i.e.*, whether an ambiguity exists. *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385 (1986).

■ At the outset, we would note our agreement with the Board that the payment for extra-depth undercut was not ambiguous in the contract. Indeed, the special provision on which Dick relies as support for its clear language argument addresses only "undercut" under MSE walls and makes no mention of extra-depth undercut. As to the undercut, both the Board and Dick relied on the special provision and the two cross-sectional drawings on pages 16 and 17 of the cross-sectional sheets which indicated on parts of the sheet that Class 1A excavation was required. DOT acknowledges these notations, but asserts that they were mere inadvertent mistakes and that the notations were placed there in error. DOT notes that the notations are not utilized in any other cross-sections, are not contained on the cross-section legends, and have no ending point indicated on them. Accordingly, DOT asserts that, although the erroneous notations could have created some confusion concerning the required excavation and the payment thereof, the relevant provisions of the contract are not ambiguous because Dick's interpretations of those provisions are not reasonable. After examining the contract, the Board's opinion and the evidence offered before the Board, we cannot agree with DOT that the Board's award to Dick was in error.

Examining the special provisions of the contract, as well as the cross-sections, it seems clear that an ambiguity does exist concerning the payment for undercut under the MSE walls. The special provisions provide that such undercut is to paid as Class 1A "Special" Excavation while the cross-sections indicate that such areas are to be paid as Class 1 excavation with either foreign or select borrow backfill. Although this conflict is not obvious, it is nonetheless present when the two provisions, which are given equal weight in the contract, are read together. Accordingly, we believe that the Board correctly awarded Dick additional payment for 3,237 cubic yards under the MSE walls at the Class 1A rate of $50 per cubic yard, minus DOT's previous payments for this excavation.

Accordingly, the Order of the Board is affirmed.

### ORDER

NOW, January 21, 2000, the order of the Board of Claims involving the appeals docketed at Nos. 1454 and 1505 C.D.1998 is affirmed, and the appeals docketed at Nos. 308 and 412 C.D.1998 are hereby dismissed.