IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kinsley Equities II, LLP, on behalf of : 
itself and Wayne H. and Susan N. : 
Blessing and Robert N. and Agnes M. : 
Blessing, :
                Appellants :
                                   :
          v. : No. 1164 C.D. 2018
Hellam Township Zoning Hearing : ARGUED: April 11, 2019
Board :
                                   :
          v. :
                                   :
Hellam Township :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                              FILED: May 3, 2019

In this matter, Appellants Kinsley Equities II, LLP (Kinsley Equities), on behalf of itself and Wayne H. Blessing, Susan N. Blessing, Robert N. Blessing, and Agnes M. Blessing (Appellants), appeals from the July 19, 2018, order issued by the Court of Common Pleas of York County (Trial Court). This order affirmed the Hellam Township Zoning Hearing Board's (Zoning Board) August 22, 2017, decision denying Kinsley Equities' application for a demolition permit, through which Kinsley Equities sought permission to demolish a cluster of buildings that are situated on a parcel of land known as "Lot 11." Lot 11 is in Hellam Township,

Pennsylvania (Township) and is owned by the Blessings. After thorough review, we affirm the Trial Court.

Lot 11 was originally part of the Blessings' larger, 153-acre property (Property), located at the intersection of Route 30 and Cool Creek Road in the Township. Zoning Board's Decision, Findings of Fact (F.F.) ¶1. This Property contained, among other things, a historic residence known as the "Mifflin House," which had been used as a waystation on the Underground Railroad, as well as a barn and several other farm-related structures. Reproduced Record (R.R.) at 830a-42a.

At some point during 1997, the Blessings hired Kinsley Equities to assist with the Property's development and, in furtherance of this goal, Appellants filed a preliminary subdivision plan (Preliminary Plan) with the Township for a project known as "Wright's Crossing Business Park" (Wright's Crossing) in early 1998. Zoning Board's Decision, F.F. ¶3; R.R. at 696a; Appellants' Br. at 4.[1] This Preliminary Plan called for the Property to be subdivided into 13 separate lots, including Lot 11, which would contain each of the aforementioned buildings, and was submitted with a notation on the attached subdivision map stating "EXISTING FARM COMPLEX [on Lot 11] TO REMAIN." R.R. at 699a. Appellants were aware at that time of the cultural, historical, and natural features of the Property, as it had to submit a "Natural and Cultural Features Impact Assessment Report" to the Township as part of its subdivision application paperwork. *See* R.R. at 809a-44a.

Appellants subsequently filed a final subdivision plan (Final Plan), which contained the same notation regarding preservation of the buildings on Lot 11. *Id.* at 717a, 719a. Appellants' engineering firm, LSC Design, Inc., presented both the

---

[1] It is not exactly clear when planning of the Wright's Crossing project began; however, the earliest documents in the record date to October 1997. *See* R.R. at 822a-25a, 827a-28a, 832a-33a.

Preliminary and Final Plans to the Township's Planning Commission at a meeting held on September 24, 1998. *Id.* at 26a-27a. Two of the Planning Commission's members raised concerns during the course of this meeting regarding the Lot 11 notation, questioning why it was not worded with more specificity and opining that it could "legally obligate [the] Blessing[s] to retain the marked buildings [on Lot 11], rather than [allowing the Blessings] to demolish them at a later date." *Id.* at 27a. Ultimately, the Planning Commission recommended that both the Preliminary and Final Plans, with the language "EXISTING FARM COMPLEX TO REMAIN," be approved by the Township's Board of Supervisors. *Id.* at 27a-28a. The Board of Supervisors subsequently approved both the Preliminary Plan and Final Plan, after which the Blessings recorded the Preliminary and Final Plans with the York County Recorder of Deeds on November 24, 1998, and August 3, 1999, respectively. *Id.* at 696a, 717a; Zoning Board's Decision, F.F. ¶¶6-7.

At least 8 additional land use plans involving parts of the Property were submitted to and approved by the Board of Supervisors over the course of roughly the next 18 years. R.R. at 1123a.[2] None of these subsequent plans pertained specifically to Lot 11, in that none of them altered the physical bounds of Lot 11 in any manner. *See* Notes of Testimony (N.T.), 6/27/17, at 94-96. However, on each of these 8 plans, the buildings on Lot 11 were either marked by the notation "EXISTING FARM COMPLEX," or were not referenced at all. R.R. at 746a-47a, 750a-51a, 1033a-34a, 1123a.

On March 28, 2017, Kinsley Equities filed a demolition permit application with the Township, through which they sought permission to demolish seven structures on Lot 11, including the Mifflin House. *Id.* at 796a-98a; Appellants' Br.

---

[2] Appellants claim "there have been 12 subsequent approved plans that concern Lot 11," though they offer no evidence supporting this assertion. *See* Appellants' Br. at 23 n.1.

at 3-4. Rachel Vega, the Township's Zoning Officer, replied via letter on April 6, 2017, informing Kinsley Equities that its application could not be approved because of the "EXISTING FARM COMPLEX TO REMAIN" notation on the 1998 Final Plan, which Ms. Vega interpreted as "indicat[ing] the intention was to keep the farm complex as it is." R.R. at 799a.

Appellants appealed this denial to the Zoning Board on May 5, 2017, on the basis that they never intended, or were required, to restrict their ability to demolish these structures and, furthermore, that the Final Plan's Lot 11 notation had been amended via the subsequently approved plans, which had removed whatever language could be deemed an impediment to Appellants' proposed demolition. Appellants' Br. at 4; R.R. at 1096a-98a.

The Zoning Board then held a public hearing on June 27, 2017. Ms. Vega testified regarding her decision to deny Kinsley Equities' demolition application, reiterating her opinion that the notation on the Final Plan evinced an intent to preserve Lot 11's complex of buildings in perpetuity and, in addition, pointing out that this notation's potential import had been discussed at the Planning Commission's September 24, 1998, meeting. N.T., 6/27/17, at 20-27, 114-41.

Timothy Kinsley, Kinsley Equities' president, then gave a detailed recounting of his company's involvement with Wright's Crossing since that project's inception, explaining that it was never Appellants' intent to place a self-imposed preservation requirement upon Lot 11 and, furthermore, that Appellants always planned to eventually demolish Lot 11's complex of buildings as they continued to develop Wright's Crossing. *Id.* at 35-63, 75-100. To that effect, Mr. Kinsley stated:

> ["]To remain["] was removed [from the subsequent plans]
> because, as we started to get users for [Wright's Crossing],
> and started to see the development occurring, we knew
> that the time was soon coming where we would be needing

4

> this land [*i.e.*, Lot 11] as a building lot, and we no longer thought that the [complex of buildings] was going to be necessary for the continued farm operations. And we removed ["]to remain["] because the intention was, and always had been, from day one, to eventually remove them.

*Id.* at 61.

Mr. Kinsley also fielded questions from a number of audience members, including June Evans, a Township resident who claimed she had contacted Mr. Kinsley while the original Preliminary and Final Plans were being considered by the Township. *Id.* at 101. Ms. Evans said she had expressed to Mr. Kinsley her "grave concern about the future of the . . . historic [Mifflin H]ouse[,]" and had been told by him that "the [H]ouse was not going to be in danger[.]" *Id.* Mr. Kinsley responded to Ms. Evans by denying that this exchange ever took place. *Id.* at 101-02. Ms. Evans was subsequently called as a witness by Appellants' attorney, whereupon she reiterated her recollection of her conversation with Mr. Kinsley in 1998, opining in part that she could not definitively speak to his intentions, but thought "he understood . . . our concerns about the historic nature of the [Mifflin H]ouse." *Id.* at 142-45.

Representatives from several historical and preservation advocacy organizations, as well as several local residents, then gave statements in opposition to Kinsley Equities' demolition application. Each of them focused, with varying degrees of specificity, upon the importance of preserving the Mifflin House and surrounding structures, due to their historical import. *See id.* at 150-80. Most of these individuals spoke broadly, without specific reference to the Preliminary Plan or Final Plan. The exception was Katina Snyder, a representative from the Kreutz Creek Valley Preservation Society. Notably, Ms. Snyder was also a member of the

Township's Planning Commission in 1998, when it reviewed the Wright's Crossing plans. R.R. at 26a-29a.

Ms. Snyder said her organization had always construed the Preliminary and Final Plans' Lot 11 notation as protecting the aforementioned complex of buildings, including the Mifflin House:

> We, at the . . . Preservation Society, didn't get real -- what should I say -- nervous about it because that statement was on the plan. So we figured that we're safe, that it is going to remain. . . . But when they also talked about the later plans, as I think it's been pretty much made clear, that they did not refer to Lot 11. So once again we thought, okay, they're not talking about [Lot] 11, we're still safe. And that's why there wasn't a big to-do about, you know, anything that was done, because we didn't think it was going to be demolished, not in any form. We have been involved, like I said, with this whole thing since kind of the beginning, because our letter is dated, let's see -- in December 1997 we wrote a response to the L[S]C Agricultural Land Survey consultant because they requested our input about the Wright's Crossing project. And we informed them that the house may have been used by previous owners Jonathan and Samuel Mifflin as an escape route for -- with the Underground Railroad. And so, again, we figured as long as that statement is on the plan, we'll be doing okay.

*Id.* at 172-73. The Zoning Board ended the hearing shortly thereafter without voting on Appellants' appeal. *Id.* at 186.

On July 25, 2017, the Zoning Board convened another public hearing and voted unanimously to affirm Ms. Vega's denial of Kinsley Equities' demolition permit application. N.T., 7/25/17, at 7; Zoning Board's Decision, Conclusions of Law (C.L.) ¶1.[3] The Zoning Board found "that the credible testimony is that the

---

[3] The Zoning Board issued its formal, written Decision on August 22, 2017. Tr. Ct. Op. at 1.

Appellant[s] knowingly added a notation on the [Final P]lan, a notation which under the circumstances of this case was reasonable," specifically referencing the statements made by both Ms. Evans and Ms. Snyder, as well as the concerns raised by members of the Planning Commission in 1998. Zoning Board's Decision, F.F. ¶¶16, 24; C.L. ¶2. [4]

The Zoning Board concluded that any changes to the Lot 11 notation were purely descriptive in nature, rather than substantive, and did not remove the development restrictions that the Zoning Board found were in the Final Plan. *Id.*, F.F. ¶19. This was because the more recently approved land use plans pertained to other lots within the overall Wright's Crossing property, and the Township's Subdivision and Land Development Ordinance (SALDO) required identification of buildings on adjoining lots.[5] *Id.* Consequently, the Zoning Board found that "no change[s] to the restrictions enumerated on [the Final Plan regarding] Lot 11 were

---

[4] The Zoning Board also found that:

> 20. The record . . . clearly establishes that the Appellant[s'] engineer, during the course of the review and approval period, that Mr. Kinsley was advised by his own engineer [sic] that he might be creating a permanent requirement [to preserve the structures on Lot 11].
> 21. Mr. Kinsley, despite this warning, continued with the restricting notation [sic].

Zoning Board's Decision, F.F. ¶¶20-21. It is unclear how the Zoning Board determined that an unidentified engineer in Mr. Kinsley's employ warned him about the possible implications of the Lot 11 notation, as the Zoning Board does not cite to any specific supporting evidence and the record appeared to be devoid of any evidence substantiating this assertion.

The Trial Court directly quoted the Zoning Board's finding that Mr. Kinsley had been made aware by his engineer of the potential implications of the Lot 11 notation. Tr. Ct. Op. at 6. Like the Zoning Board itself, the Trial Court does not cite to any evidence in the record supporting this finding. *Id.*

[5] The Zoning Board did not cite to a specific SALDO provision that supported this assertion. However, none of the parties dispute that the Township's SALDO does contain such a requirement.

7

ever requested or approved" and concluded that the prohibition against demolishing the Mifflin House and nearby structures "runs with the land in perpetuity." *Id.*, F.F. ¶17; C.L. ¶6. Appellants appealed the Zoning Board's denial to the Trial Court on September 1, 2017. The Trial Court took no additional evidence and affirmed the Zoning Board on July 19, 2018. This appeal followed.

Appellants argue, in essence, that they did not intend, through the Lot 11 notation on the Preliminary and Final Plans, to restrict their future ability to demolish the Mifflin House and adjacent buildings. Rather, Appellants claim the notation merely marked existing physical features and memorialized that development of Wright's Crossing would not affect those structures at that specific point in time. Appellants' Br. at 15-23. In the alternative, Appellants maintain that, even in the event the Preliminary and Final Plans' Lot 11 notation imposed a preservation requirement, the subsequently approved development plans relieved Appellants of this burden, due to the removal of the words "TO REMAIN." *Id.* at 23-25. On these bases, Appellants argue that the Zoning Board erred in affirming Ms. Vega's denial of Kinsley Equities' demolition permit application. *Id.* at 25-27.

Since the Trial Court took no additional evidence, our standard of review is restricted to determining whether the Zoning Board committed an abuse of discretion or an error of law. *Valley View Civic Ass'n v. Zoning Bd. of Adjustment*, 462 A.2d 637, 639-40 (Pa. 1983). "We may conclude that the [Zoning] Board abused its discretion only if its findings are not supported by substantial evidence. . . . By 'substantial evidence' we mean such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 640 (citations omitted).

In light of this limited standard of review, we must avoid the inclination to measure and assess the multitude of factors and considerations that support a zoning

8

ruling, and "must exercise self-restraint as to substituting our opinions far removed from the particular zoning hearing for the well-considered decision of [the factfinder]." *Cohen v. Zoning Bd. of Adjustment*, 276 A.2d 352, 355 (Pa. Cmwlth. 1971). "It is, after all, the sole function of the . . . fact finder to evaluate witness credibility and assign evidentiary weight." *Lower Allen Citizens Action Grp., Inc. v. Lower Allen Twp. Zoning Hearing Bd.*, 500 A.2d 1253, 1258 (Pa. Cmwlth. 1985) (punctuation omitted). Indeed, the "fact finder is the ultimate judge of credibility and resolves all conflicts in the evidence," *Eichlin v. Zoning Hearing Board of New Hope Borough*, 671 A.2d 1173, 1175 (Pa. Cmwlth. 1996), and has "the power to reject even un-contradicted testimony if it finds it lacking in credibility." *Lower Allen*, 500 A.2d at 1258.

The Pennsylvania Municipalities Planning Code[6] allows a municipality to place conditions upon approval of a subdivision application. *Doylestown Twp. v. Teeling*, 635 A.2d 657, 660 (Pa. Cmwlth. 1993). "However, the municipality may approve subdivision plans subject to conditions only if the conditions are accepted by the applicant." *Id.*

> In practice, the preliminary plan approval process is frequently a process of contract negotiation between a developer and a municipality. In accepting a condition, a developer likely obtains a *quid pro quo* from the municipality, which *quid pro quo* may or may not be reflected in the approved preliminary or final plans. Once the thirty-day period to appeal from conditions imposed by the preliminary plan approval expires, the approved preliminary plan, including the conditions accepted by the developer, is essentially a binding contract between the municipality and the developer.

---

[6] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101-11202.

*In re Busik*, 759 A.2d 417, 422-23 (Pa. Cmwlth. 2000) (Freidman, J., concurring) (footnote omitted). "[A] subdivider's failure to object to those conditions constitutes a waiver of the right to seek review[,]" thereby causing those conditions to "run[ ] with the land [and be] binding upon all subsequent purchasers." *Teeling*, 635 A.2d at 660. Even so, this does not prevent an applicant from then seeking and obtaining approval of additional subdivision plans that modify or remove a condition imposed by virtue of the original plan. *See Capital Inv. Dev. Corp. v. Jayes*, 373 A.2d 785, 788 (Pa. Cmwlth.1977)

"[C]onditions contained in a recorded subdivision plan are enforceable even if the conditions are not specifically set forth in the deeds conveying the lots created by the subdivision." *Teeling*, 635 A.2d at 661. "Effect must be given to all the language of the instrument, and no part shall be rejected if it can be given a meaning. If a doubt arises concerning the interpretation of the instrument, it will be resolved against the party who prepared it." *Pennsylvania Game Comm'n v. Seneca Res. Corp.*, 84 A.3d 1098, 1107 (Pa. Cmwlth. 2014) (*quoting Consolidation Coal Co. v. White*, 875 A.2d 318, 326 (Pa. Super. 2005)).

Applying this legal analysis to the instant matter, it is apparent that the Appellants included the notation "EXISTING FARM COMPLEX TO REMAIN" in the Preliminary and Final Plans to facilitate the approval of the Wright's Crossing project. This language became part of the ultimate agreement they made with the Township (*i.e.*, the Final Plan). *See* N.T., 6/27/17, at 44-47. The parties claim there have been between 8 to 12 subsequently approved land use plans involving Wright's Crossing; however, only 2 of these plans are in the case record: 1 from 2000, which reverse subdivided Lots 1, 2, and 3, and another from 2007, which revised the lot

10

lines for Lots 10, 12, and 13. R.R. at 1205a-07a, 1209a-10a.[7] In the subsequent plans that are part of the record, Lot 11 buildings are either not described at all or are described simply as "EXISTING FARM COMPLEX," without the original two words "TO REMAIN." Even so, none of the parties dispute that the exact words "EXISTING FARM COMPLEX TO REMAIN" are absent from all of the more recent Wright's Crossing land use plans. More importantly, all parties agree that none of the newer plans specifically dealt with Lot 11 or *caused substantive changes to Lot 11*. *See* N.T., 6/27/17, at 81-84; R.R. at 746a-47a, 750a-51a, 1033a-34a, 1123a.

The language "EXISTING FARM COMPLEX TO REMAIN," contained in the Final Plan, is at the heart of this dispute. The exact import of this phrase is open to interpretation, as it is unclear on its face whether it meant that Lot 11's buildings would be preserved in perpetuity, or, as Appellants now argue, merely indicates that Appellants did not intend to demolish the Lot 11 structures *during the specific time period* when the original Preliminary and Final Plans were under consideration. Given this ambiguity, the Zoning Board properly considered additional evidence outside the bounds of the Final Plan, so that the Lot 11 notation could be placed in the proper context and have its true meaning ascertained. Indeed, though

> [i]t is well settled in Pennsylvania law that in the absence of fraud, accident or mistake, parol evidence as to preliminary negotiations or oral agreements is not admissible in evidence if it adds to, modifies, contradicts

---

[7] Kinsley Equities and the Blessings also filed a "Declaration of Protective Covenants for Wright's Crossing Business Park" (Declaration), which is in the record, with the York County Recorder of Deeds on February 5, 2001. R.R. 1286a-1309a. The Declaration pertains to the entire Wright's Crossing development, but does not refer specifically to Lot 11, or any of the other lots, for that matter. *Id.* Attached to this Declaration is a map of the entire, subdivided Wright's Crossing development, which includes a notation on Lot 11 that says "EXISTING FARM COMPLEX." *Id.* at 1309a.

11

> or conflicts with the written agreement between the parties. . . . However, it is equally well settled that this general rule does not apply where the agreement is ambiguous. In such a situation[,] parol evidence is admissible to explain the agreement and resolve ambiguities to ascertain the meaning of the parties.

*Daset Mining Corp. v. Indus. Fuels Corp.*, 473 A.2d 584, 592 (Pa. Super. 1984) (internal citations omitted). "Where a[n] . . . agreement . . . is obscure or ambiguous, the intention of the parties is to be ascertained in each instance not only from the language of the entire written instrument there in question, but also from a consideration of the subject matter and of the surrounding circumstances." *Com. v. Fitzmartin*, 102 A.2d 893, 894 (Pa. 1954).

As stated earlier, the evidence presented at the Zoning Board's hearing included the Planning Commission minutes from 1998, the testimony of Ms. Snyder, a representative from the Kreutz Creek Valley Preservation Society, and Ms. Evans' recollection of her conversation with Mr. Kinsley about preservation of the Mifflin House. This evidence supports the Zoning Board's conclusion that Appellants both intended to permanently preserve the structures on Lot 11 and freely elected to formalize that intent via this notation. Furthermore, it is undisputed that none of the subsequent approved plans made any substantive changes to Lot 11. As such, there is substantial evidence in the record which backs the Zoning Board's determination that the phrase "EXISITING FARM COMPLEX TO REMAIN" placed a burden upon Appellants to perpetually preserve the Mifflin House and nearby structures on Lot 11, one which was not removed or materially altered by the aforementioned, more recent land use plans.

Therefore, as the Zoning Board did not commit an abuse of discretion or an error of law, we affirm the Trial Court's July 19, 2018, order.


_____
ELLEN CEISLER, Judge

Judge Brobson concurs in result only.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kinsley Equities II, LLP, on behalf of : 
itself and Wayne H. and Susan N. : 
Blessing and Robert N. and Agnes M. : 
Blessing, : 
              Appellants : 
               : 
      v. : No. 1164 C.D. 2018 
Hellam Township Zoning Hearing : 
Board : 
               : 
      v. : 
               : 
Hellam Township : 

# **O R D E R**

AND NOW, this 3rd day of May, 2019, the Court of Common Pleas of York County's July 19, 2018, order, which affirmed the Hellam Township Zoning Hearing Board's August 22, 2017, decision denying Kinsley Equities II, LLP's application for a demolition permit, is AFFIRMED.

_____

ELLEN CEISLER, Judge